**JAMIESON et al. v. WATTERS et al.**
**BLAIR et al. v. SAME.**
**Nos. 4192, 4193.**

Circuit Court of Appeals, Fourth Circuit.
June 26, 1937.

Arthur M. Boal, William M. Chadbourne, Bruce R. Tuttle, and George Pfeil, all of New York City, and Albert L. Cox, of Washington, D. C. (Tompkins, Boal &

Tompkins, of New York City, R. E. O'Connor and A. Garnett Thompson, both of Charleston, W. Va., Alfred H. Phillips and Smyth & Tuttle, all of New York City, and Poffenbarger & Poffenbarger, of Charleston, W. Va., on the brief), for appellants.

Stanley C. Morris, of Charleston, W. Va., Thomas R. White, of Philadelphia, Pa., and Charles A. Marshall, of New York City (White & Clapp, Hepburn & Norris, and Thomas Hart, all of Philadelphia, Pa., Hines, Rearick, Dorr & Hammond, of New York City, Steptoe & Johnson, W. E. Miller, and Arthur B. Hodges, all of Charleston, W. Va., Milbank, Tweed, Hope & Webb, Wm. D. Gaillard, Jr., and W. Crosby Roper, Jr., all of New York City, on the brief), for appellees.

Before PARKER and SOPER, Circuit Judges, and CHESNUT, District Judge.

PER CURIAM.

On April 5, 1937, the District Court finally confirmed a plan for the reorganization of the Hamilton Gas Company, a Delaware corporation having properties in West Virginia and Kentucky, under section 77B of the Bankruptcy Act (11 U.S.C.A. § 207). From the order of confirmation this court on May 4, 1937, allowed appeals under section 24b of the act (as amended 11 U.S.C.A. § 47(b), upon petitions of certain unsecured creditors and preferred and common stockholders. The assignments of errors of the several appellants present numerous objections to the order, but, as it is well settled that the scope of the appeal under 24b is limited to errors of law as distinguished from findings of fact, it will be sufficient to consider only two questions, which are dominant in the controversy here presented. These are, first, as the stockholders were entirely excluded from any participation in the plan, was the insolvency of the corporation fairly determined in the District Court; and, second, was there a sufficient finding of facts to enable the court to determine the fairness of the plan as to the unsecured creditors, in contrast with the bondholders?

A consideration of these two questions requires some statement of the financial condition of the corporation. We fail to find in the extensive record any precise and summarized balance sheet of assets and liabilities as of the approximate date of the order, and the trial judge has not aided us by filing a written opinion giving the principal reasons for confirming the plan, or stating findings of fact and conclusions of law applicable thereto, but we gather from the record and briefs of counsel that the financial condition of the corporation at that time was substantially as follows:

The Hamilton Gas Company was organized in 1927 to produce and sell natural gas. It holds physical properties and gas leases in West Virginia and Kentucky, and owns the stock of several subsidiaries, engaged in similar business, the principal ones being the Thompson Gas Company and the Larner Gas Company, both having properties in West Virginia. In 1927 the Hamilton Company made a bond mortgage in conventional form covering certain of its physical properties and those of the Thompson Company, but not of the Larner Company, under which there are now outstanding 6½ per cent. bonds, in the principal amount of $2,325,500, with interest unpaid since and including June 1, 1932. It also has now outstanding $756,500 of unsecured debenture bonds, with interest in default to the same extent. Other general claims amount to approximately $215,000. As of January 1, 1935, the total indebtedness, including bonds and general claims, and interest accrued thereon, was $4,396,104.51. As against these liabilities, the fair valuation of the assets is here in sharp controversy. The corporation is a going concern of large operations. With its subsidiaries it owns about 80,000 acres of gas producing properties or leases, of developed or potential production, with 315 producing wells, and estimated reserves of about 86,000,000 M. C.P. gas. The revenues from operations since 1933 have been increasing, being $186,493 for 1934, $231,668 for 1935, and it is said about $250,000 for 1936. It was stated by counsel at the hearing in this court, without contradiction, that the public had contributed in all about $7,000,000 in the purchase of securities of the company, of which about $2,500,000 was for the stock; but whether all, or what amount thereof, went directly into the treasury of the company does not appear from the record. Opinions in evidence of experienced gas engineers vary greatly as to the fair value. The estimate of Lapeire was $2,063,072 for all the properties; that of Day and Zimmerman, $3,000,000 to $4,000,000; and that of Billingsley, excluded from the evidence by the District Judge, $5,000,000.

■ *The question of insolvency.* The principal complaint here of the stockholders is that at the hearing in the District Court on the plan as finally amended, the judge excluded the testimony of Billingsley and other offered evidence tending to show solvency. This ruling was based on the view that by a prior order the insolvency of the company had been found, and the offered testimony was not specifically based on the contention that there had been any substantial change in the value of the properties. In our opinion there was substantial and prejudicial error in this ruling. It is true that a year before, in connection with a plan of reorganization originally proposed, there was testimony submitted from which the District Judge was justified in finding insolvency, and he did enter an order so holding; but the plan then submitted was not confirmed, and under all the circumstances disclosed by the record we do not think the stockholders should have been precluded, at the hearing a year later on a radically different plan, from submitting further testimony on the issue of insolvency which then became vital to them. In this connection it is important to note that the first plan, the hearing on which occurred in March, 1936, made substantial provision for the interests of the stockholders, and, while the question of solvency or insolvency was doubtless an important issue as to the extent and nature of their participation in the reorganization, it was not vital to them then; and there is a contention on their part that they were not then fully prepared to meet the issue. The notice given of the hearing did not specifically state that the issue would be heard and determined, and the record is not clear as to whether it was their understanding at the time that the testimony was finally closed on that issue. The result was that the finding of insolvency thereafter made by the judge in his order of June 19, 1936, was apparently based largely on the testimony of Mr. Lapeire who had been called as an expert witness on behalf of the bondholders; and the judge did not then have the benefit for what it was worth of the testimony of the experts for the stockholders which was later offered. In a matter of such critical importance to the stockholders, the offered testimony should not have been rejected when it was offered at the hearing on an amended plan in December, 1936, and again at the hearing on April 1, 1937, on the second amended plan, which excluded the stockholders from any participation in the reorganization.

■ We do not hold that in the course of a proceeding under 77B the issue of insolvency may not be determined in advance of the confirmation of a plan, or that when once fairly and fully determined, it can thereafter in all cases be reopened on demand, merely because the plan has been amended in some respects. On the contrary, whether the testimony on such an issue should be reopened is ordinarily a matter in the sound discretion of the trial judge; but in this particular case the circumstances as to what happened at the first hearing, the lapse of time, and the important change in the plan, in our opinion required a reopening of the question in the interests of fairness and substantial justice.

■ It also appears from the record that, at the first hearing on the original plan in March, 1936, in connection with the testimony relating to insolvency, counsel for the stockholders requested the court to cause an independent appraisal of the value of the property to be made, but this was refused. Ordinarily the ruling on such a request is a matter in the sound discretion of the court, but, as there must be further proceedings in this case on this issue of insolvency, we take the occasion to say that, under the circumstances of this particular case, the request made would seem to have been a reasonable one. The debtor corporation itself was denying its insolvency, and its affairs and assets and income had been for the last four years under the management of receivers and trustees so that it had no available funds to defray the expense of such an appraisal. And it is quite important where stockholders, representing a large investment, are to be excluded from all interest in the reorganization that the court should be fully and accurately informed by reliable evidence as to the value of the property with which it is dealing, and not be obliged to rely largely on expert testimony produced by the proponents of the plan of reorganization. National Surety Co. v. Coriell, 289 U.S. 426, 53 S.Ct. 678, 77 L.Ed. 1300, 88 A.L.R. 1231.

■ *Was the plan fair to the unsecured creditors?* A substantial proportion of them earnestly contend that it was not. The answer depends on definite findings as to certain facts which were not determined by the District Court and cannot be determined from the record in the case. And

in their absence we are unwilling to affirm the confirmation of the plan.

The plan provides that new 15-year 4 per cent. bonds, par for par, for principal, be given to the old bondholders, and that from a new issue of 100,000 shares of no-par common stock, 30 shares be allotted to the holder of each $1000 bond, in consideration of reduced interest rate and accumulated unpaid interest (now amounting to about $325 per bond), and that 2 shares of common stock be given to the unsecured creditors for each $100 of claim, principal and interest; and that the management of the new corporation to be formed be given to representatives of the bondholders under a voting trust arrangement.

The amount of the unpaid interest on the mortgage bonds is about $750,000, and the amount of the unpaid principal and interest of the unsecured debentures and other general creditors is approximately $1,250,000. It is estimated that by the plan 69 per cent. of the new stock will go to the secured bondholders and only 26 per cent. to the unsecured creditors. If the division were made in the ratio of the bond interest to the unsecured claims, the proportion of the division would be about 37 per cent. to the bondholders and 63 per cent. to the other claims, and on this basis it would appear that the plan is not fair to the general creditors. On the other hand, the bondholders are making a substantial concession as to their future interest rate and it is uncertain to what extent the fair value of the property, or its future earnings would constitute real security for all or a part of the unpaid bond interest. It is difficult of course to appraise these conflicting equities, and if this were all we should not be disposed to disturb the District Court's conclusion in the matter in confirming the plan. But the situation would fairly afford a more definite comparison of the respective equities if the value of the *free assets* which would be applicable to the claims of the unsecured creditors on liquidation were known. In the present state of the record we cannot with any certainty determine what is the fair value of the free assets. On one or more occasions during the course of the proceeding the District Judge was requested by the creditors to make these findings but the record fails to show that he did so. He did find insolvency but did not find even approximate fair value of the whole property. The master's report, to which creditors urged exceptions in many particulars, but which was confirmed by the judge, apparently found free assets to be less than $50,000. In contrast therewith the amended plan confirmed by the judge excluded an intercompany debt of about $1,000,000 due to Hamilton from Larner from the lien of the new mortgage, as well as the stock of Larner. There was also an undetermined question left open by the judge as to the status of about $650,000 of cash in the hands of the trustees resulting from operations of the property in receivership and bankruptcy from 1932 to 1937. Of this amount $300,000 has been invested by the trustees under an order of court in the purchase of outstanding bonds of Larner, but without determination whether they should belong to the bondholders or constitute free assets. Under the plan confirmed they are to be subject to the new mortgage; but the open account of $1,000,000 is not.

Whether the plan is fair to general creditors is thus seen to depend on two factors which can be but have not been heretofore determined; one, what amount of the unpaid bond interest is secured by the present mortgage at the fair valuation of the property covered thereby, and two, what is the fair value of the free assets. We do not mean to suggest that in all such cases under 77B mathematically precise findings as to such values are required, but some reasonable approximation of them is clearly necessary in this case to make a fair plan for the creditors. For illustration, if the present value of the mortgaged property is approximately equal to the principal of the bonds, $2,325,500, as the bondholders themselves contend, but the free assets are worth $1,000,000, then it would seem highly inequitable to give 69 per cent. of new stock to bondholders and only 26 per cent. to general creditors, when the claims of the latter aggregate about 63 per cent. of the total unsecured claims. And the consideration that the bondholders are reducing their interest rate for the future from 6½ per cent. to 4 per cent. is offset by the consideration that they in effect obtain much better security for their principal when the free assets of $1,000,000 are available to them on default, ahead of the present creditors who are reduced in grade to common stockholders.

Again, even if the fair value of the mortgage security is sufficient to cover all or part of the unpaid bond interest, or if a substantial portion of the accumulated cash is applicable to payment of that interest, and the free assets remain the same, the

plan would likewise seem unfair to unsecured creditors. Thus, if the value of the mortgaged property be found to equal the principal and accrued interest on the bonds, then under the plan confirmed, the bondholders are contributing $750,000 to the new corporation to be represented by its stock, but, as the free assets, which in that case would be applicable to the claims of unsecured creditors, are assumed to be $1,000,-000, the unsecured creditors are contributing the latter amount, and the ratio of division of the stock indicated as fair would be in the proportion of 75 to bondholders and 100 to unsecured creditors; instead of the ratio of 69 to bondholders and 26 to unsecured creditors.

We do not intend by these illustrations to suggest any particular ratio of division between the two interests as fair and equitable but only to point out that until findings have been made as to the value of the mortgaged assets and the free assets respectively it is not possible to determine what division would be fair, and on the record as presented it does not affirmatively appear that the ratio in the plan is fair.

■ It appears that the trial judge was somewhat influenced in confirming the plan by the consideration that unless some plan was adopted there might be a foreclosure in equity—with a sacrifice sale, and the swelling of the general claims by proof on the part of the bondholders of the whole face amount of their claims in competition with the general creditors, that is, by the application of the federal equity rule in contrast with the bankruptcy rule which requires that a secured creditor first apply the value of his security to the reduction of his claim and prove against the free assets for the deficiency only. Of course, this is a risk that the general creditors in this case must take if there is no plan agreed upon by the requisite amount of the bondholders and confirmed, but even so, there is the alternative that the trial judge under 77B may liquidate in bankruptcy where the other rule would apply. But, however this may ultimately develop, we do not think the consideration should be controlling at this time when the proceeding is in fact still in bankruptcy and the question of the fairness of the plan to the general creditors should be determined on the basis of the facts as they may be shown to be in this present proceeding.

There is one other matter which may be mentioned. Some of the appellants contend that the plan has not been approved by the requisite two-thirds of the general creditors. The appellees say the plan has been approved by 75.6 per cent. of the general creditors. The trial judge held that the plan had been approved by the requisite two-thirds of general creditors. The contention to the contrary is based on the fact that the claims of the majority of the debenture holders (the total issue being about $750,000) which were voted in favor of the plan, were voted by the Protective Committee for that issue of securities without reporting to the individual depositors material changes in the plan which had been made after the rejection of the first amended plan by the court in December, 1936. It is also contended that about $100,000 of depositors tried to withdraw their claims from the Committee to vote against the plan, but were refused permission by the Committee because they failed to pay a required assessment, and that if these claims were deducted it does not appear that there were acceptances from two-thirds.

■ The issue thus presented has not been very fully elaborated in the briefs of the contending parties; but from our inspection of the depositary agreement of January 28, 1932, relating to the debentures, we find that the depositors did not have the right to withdraw them from the control of the Committee except upon the condition that they pay the required assessment. It would follow, therefore, that the debenture holders who sought to withdraw the voting power on their securities from the Committee but refused to pay the assessments were not justified in their position. On the other hand, the depositary agreement provides that notice of plans of reorganization must be given to the depositors by the Committee so that the depositors, if they desire, may exercise their right of withdrawal upon payment of the required assessment. In this case the notice of the plan as amended on April 1st was not given only because in the opinion of the Committee the changes were not material, and this view was subsequently confirmed by the action of the district judge. It is, however, our opinion that the changes between the '36 plan and the '37 plan, which resulted in the determination of the judge to confirm the '37 plan when he had previously refused to confirm the '36 plan, were material. The changes consisted in the elimination from the new mortgage of the Larner properties, which were of large value, and also an important change in the personnel of the new manage-

ment, in that two of the three proposed representatives of the debenture holders on the new board of directors were dropped in the amended plan.

The Hamilton Company and its subsidiaries, Larner and Thompson, have now been in the District Court in equity or under 77B for nearly five years, and it is recognized by all that its future status should with all possible despatch be determined, so that its business can go forward without further litigation. We have therefore rendered our decision on these appeals with as much promptness as was consistent with a study of the lengthy record and briefs of counsel. It may be regrettable that further legal procedure is necessary, but large interests are involved and the proper determination of the rights of these several interests requires an accurate ascertainment of the financial affairs of the company in the respects we have above mentioned.

In reversing the order of confirmation appealed from, we point out that another hearing, after due notice, should be promptly given to all interested in the plan, at which time the stockholders and others if they request it should be permitted to offer additional evidence as to solvency or insolvency of the company under present conditions; and the court should require the submission of available testimony to show (a) the probable present value of the presently mortgaged assets, and (b) the value of the free assets, which will require of course a determination (c) of what assets are now subject to the lien of the mortgage, and (d) to what extent the cash now in the hands of the trustee or the investment thereof, is a free asset or subject to the lien of the mortgage in favor of the bondholders for principal or interest; and (e) it should be determined with such approximate accuracy as is possible what can reasonably be expected to be the net revenues from operation in the near future. Until these matters are ascertained, it will not be possible to determine with any substantial accuracy whether the present plan or any amendment thereof is fair and equitable and feasible. And, while the stockholders are not legally entitled to participate in any new plan if the company is clearly insolvent, it is not unreasonable to allow them some absolute or conditional interest in the future prosperity of the company if the question of present insolvency is doubtful and there is shown to be some definite prospect of future enhanced earnings more than

sufficient for a reasonable return on present indebtedness, after due allowance for depreciation and depletion.

Reversed and remanded.