**PRICE et al. v. SPOKANE SILVER & LEAD CO. ***

No. 10968.

Circuit Court of Appeals, Eighth Circuit.

June 13, 1938.

*Rehearing denied July 5, 1938.

E. B. Adams, of Hot Springs, S. D. (W. P. Rooney and C. S. Eastman, both of Hot Springs, S. D., on the brief), for appellants.

Charles C. Goldman, of Cleveland, Ohio (Goldman & Wyman, of Cleveland, Ohio, and Gale B. Wyman, of Deadwood, S. D., on the brief), for appellee.

Before GARDNER, SANBORN, and THOMAS, Circuit Judges.

SANBORN, Circuit Judge.

This appeal from an order confirming a plan of reorganization of the Spokane Silver and Lead Company, a debtor corporation which filed a petition for reorganization under Section 77B of the Bankruptcy Act (48 Stat. 911, 912, 11 U.S.C. § 207, 11 U.S.C.A. § 207), is taken by objecting creditors.

■ Since confirmation of a plan of reorganization is a "proceeding in bankruptcy," the petition for the allowance of the appeal was properly made to this Court, under section 24b of the Bankruptcy Act, 11 U.S.C. § 47(b), 11 U.S.C.A. § 47(b). Meyer v. Kenmore Granville Hotel Co., 297 U.S. 160, 56 S.Ct. 405, 80 L.Ed. 557.

■ The debtor has moved to dismiss the appeal as having been taken out of time. The record discloses that the order appealed from was entered May 3, 1937; that the petition for allowance of the appeal was filed in this Court on June 2, 1937; that notice of a hearing upon the petition to be held June 14, 1937, was served upon an attorney of record of the debtor on June 8, 1937; and that, after the hearing held on June 14, this Court entered an order on June 29, 1937, allowing the appeal.

Section 24c of the Bankruptcy Act, 11 U.S.C. § 47(c), 11 U.S.C.A. § 47(c), provides: "All appeals under this section [24] shall be taken within thirty days after the judgment, or order, or other matter complained of, has been rendered or entered." The debtor argues that the failure of the appellants to notice the petition for hearing and to secure the allowance of the appeal by this Court within thirty days from the date of the challenged order requires a dismissal of the appeal. It is our opinion that an appeal is "taken" within the meaning of section 24c when a proper petition therefor is filed within thirty days from the date of the entry of the order. The failure of this Court to act upon such a petition within the thirty-day period does not require nor permit the dismissal of an appeal allowed after the expiration of the

thirty-day period. This is nothing more than a common-sense interpretation of the applicable section and is in accord with the rulings in other Circuits. In re Hoffman, 7 Cir., 82 F.2d 58, 59; In re National Lock Co., 7 Cir., 82 F.2d 600, 605; In re Foster Construction Corporation, 2 Cir., 49 F.2d 213, 214. In the First Circuit it is regarded as permissible practice to set down for hearing the petition for leave to appeal and the merits of the case at the same time and to dispose of both in one decision. Downtown Inv. Ass'n v. Boston Metropolitan Bldgs., Inc., 1 Cir., 81 F.2d 314, 317.

The debtor corporation was organized under the laws of South Dakota. Its business was the development and operation of mining claims and mining property owned by it and located entirely within Custer County, South Dakota. On January 27, 1933, in a suit brought by Steve Ainslie and Mark J. Kelly against the debtor and others, in the Circuit Court of the Seventh Judicial Circuit in Custer County, South Dakota, Thomas W. Delicate was appointed receiver for the debtor, to take possession of all of its property. Thereafter such proceedings were had in that court that on January 31, 1933, a decree was entered directing the receiver to sell all of the property of the debtor and to pay, from moneys received by him, claims according to the following priorities:

(1) The costs of the receivership and taxes, which the court adjudged to be liens superior to all other claims and liens.

(2) The miner's lien claim of Harry S. Price and T. A. Ferneding for $56,163.58 and interest, which the court decreed to be a valid and subsisting lien upon all property and money of the debtor.

(3) The miner's lien of A. W. Margileth for $2200 with interest, which was decreed to be a valid and subsisting lien upon all such property.

(4) The miner's lien of W. D. Philips for $1500 and interest, which was decreed to be a valid and subsisting lien upon all such property.

(5) The lien of Lorain Street Savings and Trust Company, as trustee under a deed of trust securing an issue of $250,000 of 7%, ten-year gold bonds, which was decreed to be a valid and subsisting lien.

(6) The judgment of Mark J. Kelly for $8,627 and interest, which was decreed to be a valid lien.

(7) The judgment of Steve Ainslie for $11,905 and interest, which was decreed to be a valid lien.

(8) The judgment of the Mine and Smelter Supply Company for $605.56 and interest, which was decreed to be a valid lien.

(9) The judgment of George Williams and F. W. Sellers for $4,025.58 and interest, which was decreed to be a valid lien.

The State court further decreed that, after the payment of these liens, any moneys remaining in the hands of the receiver should be applied to the payment of the claims of Rapid City Lumber and Machinery Company, Shann & Welty Lumber Company, the Superior Creamery, C. X. Covertson, and the Black Hills Wholesale Grocery, which were decreed to be general claims; and that, if, after the payment of the liens and general claims as determined by the decree, there were any moneys left in the hands of the receiver, such moneys should be paid to the debtor.

The record shows that the Lorain Street Savings and Trust Company, trustee, was granted an exception to the decree, but that no appeal was ever taken.

After the entry of the decree, the receiver, as thereby directed, sold the property of the debtor to a new corporation known as Spokane Silver and Lead Company, Incorporated, upon its offer to pay "$4,253.62 in cash, together with its receipt for credit on first liens it is now the lawful owner of, the sum of $51,909.96;" to give preferred stock to bondholders equal to the face of their bonds plus 10%; to give to judgment creditors and lienholders preferred stock and two shares of common stock up to the full value of their respective claims; to give preferred stock in satisfaction of general claims; to give certain noteholders 122,696 shares of common stock, and to give the stockholders of the debtor 405,000 shares of such stock. This sale was confirmed by the State court on August 29, 1933, but the terms of the offer were not carried out, and, by a decree of the State court, filed December 6, 1935, the sale was vacated and declared void and the receiver directed to repossess himself of the property of the debtor and to resell it. The receiver sold the property on January 14, 1936, one day after the petition of the debtor for reorganization under § 77B was filed.

In this petition the debtor stated that its properties are "subject to a mortgage bond

issue of $250,000, various miners' and judgment liens, notes and open accounts, all as more particularly shown on said Exhibit 'A'."[1]

As grounds for relief under § 77B the petitioner stated that "its assets consist of said mining claims and property which are only of value in case the same are further developed and operated"; that "it is unable to borrow or otherwise procure funds at this time sufficient to meet and discharge the said debts, or to protect said property, and that because thereof, reorganization of the debtor is clearly necessary"; and that it "believes that such reorganization can be carried out more economically and expeditiously, and for the benefit of all parties interested therein and having claims against said [debtor] Company, under and in pursuance to Section 77B, Chapter 8 of the Acts of Congress relating to Bankruptcy, 11 U.S.C.A. § 207 and that reorganization under said section would be for the best interests of the creditors and security holders of all classes of the debtor."

Thereafter, on August 14, 1936, the debtor filed a plan of reorganization in which it is stated:

"This company and its predecessors, namely The Spokane Lead and The Cuyahoga Mining Company (both having merged into The Spokane Silver and Lead Company), have been engaged for more than thirty years last past in the mining of lead, gold and silver on forty-nine mining claims covering 910 acres of land located in Section 26-27 and 35 T. 2S.-R. 6E., Custer County, South Dakota, and in Section 20, 21, 28, 29, 32 and 35 T. 2S.-R. 6E., Custer County, South Dakota, the former location comprising the so-called 'Spokane Group' and the latter location comprising the so-called 'Cuyahoga Group'. Substantial sums have been expended for a main shaft on the Spokane mine property which is now 340 feet deep. Long tunnels leading therefrom on the one hundred, two hundred and three hundred feet levels have been drifted. These tunnels extend in some instances over 500 feet long. The total footage being 1440 feet. These excavations together with a 54 foot raise from the 300 foot level, proved the existence of vast ore bodies easily accessible.

"There are considerable permanent buildings on the property, all in a good state of repair, consisting of: the superintendent's house, bunk house, flotation plant, forge, boiler room, power house, mess hall, one hundred ton four story mill, assay office, commissary, and general office, besides numerous other small buildings. There is also considerable equipment and tools used and employed in mining operations.

"It is further estimated that there is approximately 10,000,000 feet of standing timber on this property, which timber is necessary and required in mine operation. There is an estimated and blocked out 96,000 lead ore tonnage in the east drift of the main shaft of the Spokane Group, as set forth in plans prepared January 1, 1931 by W. J. Wilbur Harris, Engineer, and ap-

---

[1] "Exhibit A."

"An approximate statement of the indebtedness of the Spokane Silver & Lead Company as of December 31st, 1935.

Bonds secured by mortgage on the Company's property in South Dakota...... $250,000.00 (together with unpaid interest thereon)

Various Miners' and Mechanics' Liens and Judgments.. 86,708,87 (The validity of the above liens is disputed by the Debtor)

Lien of Jos. H. Winterbottom and The Winterbottom Company ................ 81,763.72 (Released of record in connection with agreement referred to in the petition). This lien also includes much of the unsecured indebtedness hereinafter set out.

Various notes as follows:

| | |
|---|---|
| Lorain Street Savings & Trust Co., Cleveland, O. | 22,000.00 |
| Standard Trust Bank, Cleveland, Ohio......... | 17,000.00 |
| Frank Korte, Detroit, Michigan, ............ | 2,500.00 |
| Harry S. Price and T. A. Ferniding, Dayton, O.... | 6,000.00 |
| C. W. Sommers Estate, Cleveland, O........... | 43,240.00 |
| J. A. Foerstner, Cleveland, Ohio ................. | 42,115.00 |
| Jos. W. Winterbottom, Cleveland, Ohio........ | 37,341.00 |
| Unsecured claims largely in and about Custer and Rapid City, South Dakota...... | 54,000.00 |

Approximate Total. $642,668.59 (Less duplication of $54,000.00 of unsecured claims which are included in Winterbottom Company claim.)"

proved by Minor T. Phillips, the then superintendent of the mine property, and there are other vast ore bodies in this group. There are also vast ore bodies as evidenced by outcroppings and diamond drills in the Cuyahoga Group, consisting of iron, gold, paint ores and almost inexhaustible deposits of [sulpher], graphite and other commodities. Withall, this property is very rich in lead, silver and other metal bearing ores, and can be profitably operated as soon as prices improve, which it is hoped will be soon."

It is further set forth in the plan: That the debtor has the following assets: Cash, $121.78; notes receivable, $7,000; securities, $12,000; development buildings, equipment and roadways, $911,358.41; Spokane Mine Property, $1,228,893; Cuyahoga Mine Property, $1,036,039.17. That it has the following liabilities: Accounts payable, $239,047.36; liability on bonds, $204,470.00; capital stock liability, $2,751,895. That bondholders, lienholders unsecured creditors, secured creditors and stockholders will be affected by the plan, but that debts entitled to priority under the law and the unpaid obligations incurred by the State court receiver and those incurred by the debtor in the § 77B proceedings will not be affected; that it is proposed (1) that bondholders shall agree to extend the payment of the principal due upon their bonds to April 1, 1945, and shall waive interest until the debtor shall be on a "profit-paying basis of an amount sufficient to pay its current obligations plus interest on said bonds"; (2) that stockholders shall retain their present stockholdings; (3) that unsecured creditors shall receive common stock in an amount equal to the principal of their claims, in full payment, except that any of such creditors who desire payment in cash may have the option of accepting one-half of their claims in cash over a period of 6½ years without interest; (4) that secured creditors and lienholders shall be treated on a parity and shall receive two shares of common stock for each dollar of such lien and secured claims; (5) that the debtor shall assume the obligations incurred by the State court receiver and the expenses of the § 77B proceeding, to be paid in cash as and when due. The plan of reorganization prayed that creditors, stockholders, bondholders and other interested parties should file their claims on or before September 14, 1936, if they desired to vote upon the plan, on which day a hearing would be held for that purpose.

Notice was given to interested parties to file their claims on or before September 14, 1936, on which day the question of retaining the debtor in possession, and classification of all parties affected by the plan, would come before the Court.

On September 14, 1936, Mark H. Kelly, deceased, by his successor in interest Mary Bell Kelly, S. E. Ainslie, W. P. Rooney, et al., Harry S. Price, T. A. Ferneding, P. J. Sheridan, et al., and Price Brothers Company, some of whom were judgment creditors and others general creditors, filed answers to the petition of the debtor, asserting that each of them was a creditor and that each objected to the plan of reorganization for various reasons and in general; that the plan was not proposed in good faith and impaired the security of lienholders; that the debtor could not finance the proposed reorganization and could not pay the expenses of the State court receivership, and that the debtor's petition was filed and the reorganization proposed for the purpose of hindering and delaying creditors. Each answer prayed a dismissal of the petition.

On December 14, 1936, the court filed an order as of November 5, 1936, which recited that the cause was heard on November 5, 1936, on the pleadings and upon the evidence; that the court finds that the plan of reorganization was duly voted upon and accepted as provided by § 77B; that application for confirmation of the plan has been filed; that the creditors are classified as set forth in " 'Order Classifying Creditors, etc.' heretofore filed herein and that the written acceptances and consents to the Plan of Reorganization as filed herein have been received as set forth in said Order"; that the plan is fair and equitable and does not discriminate against any class of creditors, stockholders or bondholders, and is feasible; that a hearing on confirmation of the plan and application for the allowance of attorneys' fees and costs will be had on the 9th day of December, 1936; that the following claims are the only claims which have the right to participate as Class B (general creditors): Charles A. Somers, $68,239.70; A. W. Margileth, $2,200.00; John A. Foerstner, $43,565.63; Henry & Boldorf, $491.81; Mark J. Kelly (judgment lien claimant), $8,627.00; Steve Ainslie (judgment lien claimant), $11,905.00.

The order classifying creditors seems to have been endorsed as filed on November 5, 1936, and also as filed on May 3, 1937. It was excepted to by the objecting creditors on May 3, 1937. It recites that a hearing was had on November 5, 1936, upon the plan of reorganization; that notice was given to creditors and stockholders by mail and publication; that officers of the debtor offered themselves and all of the records of the debtor for examination; that the President of the debtor corporation was sworn and examined; that various creditors not named were represented by counsel; and that, upon evidence and the allegations of the debtor's petition, the court finds that the debtor, at the time the petition was filed, was insolvent; that creditors are classified as follows: Class A, bondholders; Class B, general creditors; Class C, common stockholders; Class D, creditors having tax claims; that the first three classes are affected by the plan;

that 66⅔% of each of the first two classes have accepted the plan; and that more than 50% of Class C have accepted it. The order directed that application for the confirmation of the plan be filed, and that notice be given to creditors and stockholders of a hearing to be held on December 5, 1936, to consider confirmation and acceptance of the plan, classification of creditors and stockholders, and allowance of attorneys' fees. This hearing was had on May 3, 1937. The debtor appeared, and certain creditors also appeared and objected to the classification of creditors and confirmation of the plan.

The objecting creditors introduced in evidence certain of the proceedings in the State court, including the decree establishing liens and priorities.

The debtor produced its President, who gave testimony, a part of which is set forth in the margin.[2]

---

[2] "I am familiar with the plan which is now being considered by the Court for adoption. I was present when that plan was considered and adopted by the proposers. I would say off-hand that the stockholders were the original proposers of the plan. The stockholders were all notified as to what we were going to do. We had meetings, what you would call local meetings, and those local meetings were supposed to appoint a representative from those various meetings to consider some form of procedure, and the result of these meetings—local meetings—they appointed a so-called stockholders representative to work out a plan that would be feasible and that would be fair to everyone concerned. I was not on that committee. I believe Mr. Forchner and Mr. Motter were on that committee. I can't recall any others. The stockholders were scattered over Michigan and Ohio. I attended the meeting of the committee which adopted the plan at the time the plan was adopted. We had some money in the treasury. I couldn't say how much. I haven't any records here to tell me that. Mr. Goldman has, I haven't. We received some contributions at various times from the stockholders interested, to carry our current expenses as we went along. I was consulted about how the plan was to operate.

"Q. Are you able to tell the Court how much it was proposed to raise in cash to start the operation of this plan?

"A. There was no fixed price set.

"Q. Has that amount been ascertained as yet?

"A. My own personal opinion would be not less than seventy-five thousand dollars.

"[Continuing] Tentative plans have been made. We haven't been able to formulate any definite plans because we haven't gotten our house in order. There is no use starting out trying to do something until you know you can do it. We haven't made any final last minute intimate details to raise the cash. We are reorganizing our directorship first. I have one offer from a gentleman who will come in. The last time I had word, he was ready to move in on the property, prove the property, and raise the money without costing us a nickel. In other words, we have a promise from somebody to raise the money, a Mr. A. E. Morose. He has been in the mining game several years. At the present time he is operating in Kingman, Arizona.

"Q. How much money has he agreed to advance?

"A. I am not saying we are going to accept this deal.

"Q. What are the arrangements?

"A. He agreed to put the mine on a paying basis and help to operate it.

"Q. There wasn't any definite amount fixed?

"A. No, Sir.

"[Continuing] We have no definite and fixed agreement with Mr. Morose because there are two propositions, one by which we would pay or raise sufficient money to do a little additional development work, and the other was that he would finance the entire proposition—the

244

In considering objections to the classification of creditors, the court said:

"A judgment creditor isn't a secured creditor; there isn't any question about that. If there were secured creditors here your objection [that the proposed plan did not preserve the interests of secured creditors] would be well taken, but there isn't."

At the time the debtor offered to the court a proposed order approving confirmation of the plan as workable and feasible, the court was asked whether argument was desired, and said:

"No, I don't care to hear argument. There has been no evidence to show the lack of feasibility of this plan. If this plan is not workable on paper, the Court would be justified in refusing to approve it. The more I hear about this, the more I see the adverse interests sparring at one another for an opportunity to better themselves at the other fellow's expense. I doubt whether a stockholder is in anywhere near as good position as some fellow that hasn't anything to do with the mine at all. They haven't got anything, and I don't know that they have anything to give up."

The court approved the classification of creditors, confirmed the plan, and made an allowance for the fees and expenses of the debtor's attorneys. Thereupon this appeal followed.

Since this is an appeal under § 24b, 11 U.S.C.A. § 47(b), only questions of law are before us for consideration. Downtown Inv. Ass'n v. Boston Metropolitan

---

entire capital financing. We didn't come to any definite terms. We haven't any plan at this time as to what the entire financing needs would be, but he stated that it would be a very reasonable and fair deal. The committee figured on spending about seventy-five thousand dollars; that is, initial expenses. That isn't all the money it will to take to operate the mine by any means. Before we are all through we may spend several millions or a million anyway. In my opinion it is necessary to raise seventy-five thousand dollars or less to put the plan in complete operation. We have assurance that we can raise that money from the stockholders alone if necessary. At least that is my intention. We may go to outsiders but it is my intention that the stockholders will finance it. We haven't any agreement or subscription list for the money at this time.

"In the proposed plan we have placed certain valuations on the property. We arrived at these valuations from various reports. I am not sure what that thing is valued on. I think it is on Mr. Price's engineer, but I am not certain because I don't remember those figures. It was made from information we have available in our files. We have several engineers' reports and I am not sure where these figures were arrived at.

"Q. You now think this property is valued at $2,264,932.17, do you?

"A. It all depends upon what you consider valuation.

"Q. What is your idea about it, Mr. Clair?

"A. In other words, if you were trying to sell the property tomorrow, you probably would not get fifty cents. I think it is worth several million dollars; otherwise I would not be out here.

"[Continuing] To insure the continuity of the corporation for the protection of those interested under this proposed plan, by way of finances and operation, we figure on reorganizing the directorship. They expect to have representation on that board of directors with money. One representation alone is worth about three million dollars, and we expect to have other moneyed men on that board, well able to finance the mine if they desire. They have a considerable interest in it right now. The proposed management of this concern is up to the directors after they are elected. I have had enough experience in mining to know that you have to have a management and you have to have a good management. I am not going to start in with any such organization as we have had in the past. We haven't been in a position to raise money since 1928.

"Liabilities listed in this plan are correct to the best of my knowledge. Under the liabilities we have three sub-totals and considering all these three sub-totals, the total of them amounts to $3,195,413.-36, which includes bonds and outstanding stock.

"I don't know if there is any market value for this property. I know I would not sell it if I could help it for any value.

*    *    *    *    *    *

"I don't think it will be necessary to get any additional money. The mine ought to be in such shape by that time that we wouldn't have any difficulty getting additional money. We have no actual commitments for the raising of any money. We haven't been in shape to make any plan. We have no actual commitments in writing for the raising of any money up to date."

Bldgs., 1 Cir., 81 F.2d 314, 317. We review the evidence only to ascertain if the order appealed from is wholly unsupported thereby, is contrary to law, or clearly erroneous. In re Cole, 1 Cir., 144 F. 392, 393; Shea v. Lewis, 8 Cir., 206 F. 877, 881; Good v. Kane, 8 Cir., 211 F. 956, 958; Reiss v. Reardon, 8 Cir., 18 F.2d 200, 202; Brockett v. Winkle Terra Cotta Co., 8 Cir., 81 F.2d 949, 952; O'Connor v. Mills, 8 Cir., 90 F.2d 665; Collier on Bankruptcy (13th Ed.), Volume I, page 835.

■ It is apparent that the court below erred in assuming that creditors who had obtained judgment liens antedating the filing of the debtor's petition were not secured creditors. They were secured creditors within the meaning of the Bankruptcy Act. Oilfields Syndicate v. American Improvement Co., 9 Cir., 260 F. 905; In re Cale, D.C., 182 F. 439, affirmed 8 Cir., 191 F. 31; In re Levinson, D.C., 5 F.2d 75, 77; In re Schwab Printing Co., 7 Cir., 59 F.2d 726; In re Lake County Fuel & Supply Co., 7 Cir., 70 F.2d 391; Atchison, T. & S. F. Ry. Co. v. Hurley, 8 Cir., 153 F. 503, 509; In re New York Economical Printing Co., 2 Cir., 110 F. 514; In re Fay Stocking Co., 6 Cir., 95 F.2d 961, 962.

■ Under the statutes of South Dakota (§ 2569, Compiled Laws South Dakota 1929), a judgment became a lien upon the real property of the debtor from the time it was docketed in the county where the real estate was situated. Moreover, the State court in the receivership proceedings, at a time when it had complete jurisdiction of the parties and of the subject matter, had adjudged the validity and priority of liens upon the debtor's property. We find in the record no basis for disregarding the liens and priorities as fixed by the decree of that court. It was the duty of the court below to deal with the interests of creditors as they existed at the time the petition was filed. Glenn v. Hollums, 5 Cir., 80 F.2d 555, 557.

■ It is clear that the court below erred in classifying the creditors having liens upon the debtor's property as unsecured creditors.

■ The court also erred in confirming the plan of reorganization, which made no distinction between creditors and stockholders, and placed them on a substantial parity. Unless the property of the debtor exceeded in value the amount of the claims of creditors, the stockholders had no interest to protect or preserve. In re 620 Church Street Building Corporation, 299 U.S. 24, 27, 57 S.Ct. 88, 89, 81 L.Ed. 16. We find nothing in the evidence, except generalizations and prophecies, to warrant any conclusion that the value of the assets of the debtor even equalled its liabilities, excluding its stock liability. To justify a retention of a stock interest by present stockholders of the debtor, it should appear that they have furnished an additional consideration or have an equity in the estate of the debtor after the rights of creditors are fully provided for. In re Barclay Park Corporation, 2 Cir., 90 F.2d 595. See, also, In re Day & Meyer, Murray & Young, Inc., 2 Cir., 93 F.2d 657; O'Connor v. Mills, 8 Cir., 90 F.2d 665, 667; Reading Hotel Corporation v. Protective Committee, 3 Cir., 89 F.2d 53; Wayne United Gas Co. v. Owens-Illinois Glass Co., 4 Cir., 91 F.2d 827. Stockholders are not ordinarily entitled to participate in a plan of reorganization if the debtor is clearly insolvent. Jamieson v. Watters, 4 Cir., 91 F.2d 61, 63.

■ The court also erred in assuming that if, upon its face, the plan proposed appeared to be feasible, it was to be approved unless the objecting creditors could show that it was not feasible.

■ "It is the duty of the court to scrutinize the plans of reorganization proposed for insolvent companies to make certain that the assets belonging to creditors are not by indirection diverted to stockholders. In re New York Rys. Corporation, 2 Cir., 82 F.2d 739; In re Barclay Park Corporation, supra [2 Cir., 90 F.2d 595]." In re Day & Meyer, Murray & Young, Inc., 2 Cir., 93 F.2d 657, 659.

■ Even if a large majority of the creditors had approved the plan, that would be of no avail to sustain it. In re Barclay Park Corporation, supra; First National Bank v. Flershem, 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465, 90 A.L.R. 391; In re Day & Meyer, Murray & Young, Inc., supra, page 659. It was vitally important that the court should be fully and accurately informed by reliable evidence as to the value of the property with which it was dealing, and not obliged to rely entirely on expert evidence produced by the proponents of the plan. Jamieson v. Watters, 4 Cir., 91 F.2d 61, 63.

In Warner Bros. Pictures, Inc., v. Lawton-Byrne-Bruner Ins. Agency Co., 8 Cir., 79 F.2d 804, at page 815, Judge Stone, in delivering the opinion of this Court, said with reference to a plan of reorganization:

"Obviously, this problem involves consideration and determination of many matters related to the particular business and is very largely a problem individual to the particular business. Among other elements, it involves an understanding of how and why the business came into difficulty; of what the difficulty is; of the present condition of the business and of the property; of whether there is a fair prospect that the business can be continued under some readjustment of rights; of what readjustment is workable to that end. Such understanding requires knowledge of the financial, management, and business history of the concern; of the extent, character, and condition of both assets and liabilities; of the past, present, and probable prospective earnings and expenses. Based upon such knowledge and understanding, a plan must be evolved which offers a reasonable prospect of success. In working out such plan, the rights of interested parties must be preserved through a 'fair' right of participation therein."

In order to acquire knowledge of the financial, management and business history of a concern; of the extent, character and condition of both assets and liabilities; of the past, present and probable prospective earnings and expenses, and of whether a plan proposed offers a reasonable prospect of success and is workable, there must be competent, definite, concrete, and reliable evidence from which such facts may be ascertained by the court. From the evidence in the record before us, it is impossible to gather any knowledge of the business history of the debtor, or of its past, present and probable prospective earnings and expenses. About all that the record shows is that from some time in 1933 the debtor has been in the hands of the courts. There is no evidence to show that if it is reorganized it can be operated profitably or that it has at any time been operated profitably. There is no evidence to justify a conclusion that it can obtain the necessary funds without which, concededly, no further development or operation of the mines can take place.

In First Nat. Bank v. Conway Road Estates Co., 8 Cir., 94 F.2d 736, 739, Judge Thomas, in delivering the opinion of this Court said:

"In a reorganization proceeding under section 77B [11 U.S.C.A. § 207] good faith means more than honesty of purpose. It also requires that there be a reasonable possibility of successful reorganization. Wright v. Vinton Branch Bank, 300 U.S. 440, 463, 57 S.Ct. 556, 562, 81 L.Ed. 736 [112 A.L.R. 1455]; Tennessee Publishing Co. v. American Bank, supra [299 U.S. 18, 57 S.Ct. 85, 81 L.Ed. 13]; In re Tennessee Publishing Co., 6 Cir., 81 F.2d 463; In re Loeb Apartments, 7 Cir., 89 F.2d 461; Manati Sugar Co. v. Mock, 2 Cir., 75 F.2d 284; O'Connor v. Mills, 8 Cir., 90 F.2d 665; Provident Ins. Co. v. University Church, 9 Cir., 90 F.2d 992.

"Whenever want of good faith appears the debtor's petition should be dismissed even though a plan of reorganization has not been submitted. The District Court was reversed for failure to dismiss in such a case in Provident Ins. Co. v. University Church, supra, in re Wisun & Golub, 2 Cir., 84 F.2d 1, and in Re North Kenmore Corporation, 7 Cir., 81 F.2d 656. The judgment of the District Court dismissing the petition for want of good faith was affirmed in O'Connor v. Mills, supra; in Manati Sugar Co. v. Mock, supra; and in Re Grigsby-Grunow Co., 7 Cir., 77 F.2d 200.

"In Brockett v. Winkle Terra Cotta Co., 8 Cir., 81 F.2d 949, 953, Judge Van Valkenburgh, speaking for this court, said in reference to section 77B: ' "The outstanding purpose of the Amended Act, upon which this case rests, was to afford aid in the effort to rehabilitate corporations solvent in fact but unable to meet maturing obligations." It was not the purpose to lend its aid generally and without discrimination to corporations hopelessly insolvent, and without legal resources to prosecute their business with reasonable prospect of success.'

"Considering the act itself and all these decisions it is apparent that it is the duty of the District Court to bear in mind the purpose and function of 77B at every step of the proceedings; and whenever it appears that rehabilitation of the debtor is impracticable or that injunctive relief is not sought in good faith the court in the exercise of a sound discretion should refuse the debtor further aid in harassing lienholders."

In Tennessee Publishing Co. v. American National Bank, 299 U.S. 18, 22, 57 S. Ct. 85, 87, 81 L.Ed. 13, the Supreme Court said:

"Nor do we need to inquire as to the precise limits of the concept of 'good faith' as required by section 77B. Whatever these limits may be, the statute clearly contemplates the submission of a plan of reorganization which admits of being confirmed as 'fair and equitable' and as 'feasible.' However honest in its efforts the debtor may be, and however sincere its motives, the District Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation. Subsection (f) of § 77B (11 U.S.C.A. § 207 (f) provides for the confirmation of a plan only if the District Judge is satisfied 'that (1) it is fair and equitable and does not discriminate unfairly in favor of any class of creditors or stockholders, and is feasible.' These are prime conditions. Unless the District Judge finds that the plan has these qualities, he need go no further. Unless he so finds, he has no authority to proceed."

We think it also may be safely said that it was not the intention of Congress in enacting § 77B to place crutches under corporate cripples, fit subjects for liquidation, and send them out into the business world to be a menace to all who might purchase their securities or deal with them on credit.

It may be unfortunate in this case that counsel evidently employed by the stockholders to draft, and secure the approval of, the proposed plan of reorganization, cannot be compensated for their services out of the debtor's estate, but there is nothing in the record before us to justify a finding that one dollar has been added to that estate by their efforts, and we see no justification for diminishing its assets further.

The debtor having failed to show that the proposed plan of reorganization was either fair, equitable or feasible, and also having failed to show that the stockholders of the debtor have any real interest in its assets or a right to participate in the plan of reorganization, we think the objecting creditors were entitled to a dismissal of the debtor's petition on the ground that it had not been filed in "good faith". We fail to see how any useful purpose could be served by any other disposition of the case.

The motion to dismiss the appeal is denied.

The order appealed from is reversed and the case remanded with directions to dismiss the proceedings.