**UNITED PROPERTIES INCORPORATED, and Hans Bodsgard, Appellants,**

v.

**EMPORIUM DEPARTMENT STORES, INC., Debtor, and Its Creditors Committee, Appellees.**

No. 18610.

United States Court of Appeals
Eighth Circuit.

June 1, 1967.

Rehearing Denied July 5, 1967.

Jerome B. Simon, of Maun, Hazel, Green, Hayes, Simon & Aretz, St. Paul, Minn., for appellant and filed brief with Joseph A. Maun, St. Paul, Minn.

Marcy Finke, of Finke, Jacobs & Hirsch, New York City, for appellee Emporium Dept. Stores, and Douglass, Bell & Donlin, St. Paul, Minn., were with him on the brief.

Leonard Schwartz, of Siegel, Sommers & Schwartz, Brooklyn, N. Y., for appellee, Official Creditors Committee and filed brief.

Before VOGEL, Chief Judge, and GIBSON and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The Emporium of St. Paul, Inc., a subsidiary of United Properties, Inc. (hereinafter referred to as United), the owner and operator of a large downtown department store and two leased branch

stores in St. Paul, Minnesota, sold substantially all of its operating assets to the Debtor on September 18, 1963.[1] Concurrently, the Emporium of St. Paul, Inc., changed its name to St. Paul Dry Goods, Inc., and, thereafter, St. Paul Dry Goods, Inc., was liquidated and all of its assets were transferred to United.

On the day of the sale, the Debtor entered into a twenty-five year lease agreement for the downtown store with United acting as the lessor. The Debtor agreed to make annual payments of about $450,000 per year.[2] The Debtor also accepted an assignment of the leases of the branch stores.

The Debtor, in consideration of a $400,000 reduction in the purchase price, agreed to continue to pay pensions to a number of retired employees of United (the Emporium of St. Paul, Inc.) as long as they lived. The pensions ranging from $18.00 to $150.00 per month were computed on a formula previously adopted by United. The estimated cost to the Debtor of making the pension payments was set by the accountant for the Creditors Committee at $296,000. The Debtor deposited securities having a reasonable value of $75,000 with United as partial security for its performance of the agreement.

Under an indemnity and pledge agreement entered into between the Debtor and United, the Debtor agreed to defend, hold harmless and indemnify United if it defaulted and United was forced to make pension payments to the retired employees. If a claim was made against United by a pensioner, the Debtor was to be given notice thereof and a reasonable opportunity to dispute, defend or settle said claim. If United made any payments or incurred any expenses in connection therewith and Emporium did not reimburse United within fifteen days, United was authorized to liquidate a sufficient amount of the collateral of $75,000 to reimburse United for the amount of any such payment.[3]

1. Pursuant to a settlement agreement signed on February 3, 1964, the total purchase price was fixed at $4,775,000.

2. The lease provided a minimum rental of $150,000 per year, plus additional rents based upon a percentage of gross sales. Under the terms of the lease, the Debtor was also obligated to pay ground rents aggregating $21,750 per year and real estate taxes amounting to about $140,000 per year.

3. While the Minnesota Supreme Court has not decided the question, it would appear, from a number of its recent decisions, as well as recent decisions from other jurisdictions, that employees who had retired as of the date of this agreement were entitled, as a matter of right, to receive their pensions as they came due; and could, in the event that they were not paid, maintain an action for them against United. Gorr v. Consolidated Foods Corporation, 253 Minn. 375, 91 N.W.2d 772 (1958); Hartung v. Billmeier, 243 Minn. 148, 66 N.W.2d 784 (1954).

Judge Johnsen, of this Court, in a concurring opinion, in Judd v. Wasie, 211 F. 2d 826 (8th Cir. 1954), at page 833, stated:

" * * * An examination of the more recent decisions will show, I think, that the present general view is—and soundly so—that, on such an offer, if the employee remains in the service of the employer throughout the year, he has earned the right to the bonus as additional compensation for his services, and, if the business has net profits for the year, the employer owes him such additional compensation as a contractual obligation from accepted offer. See Am.Jur., Master and Servant, § 71, pp. 501–502."

See also Minnesota Amusement Co. v. Larkin, 299 F.2d 142 (8th Cir. 1962); Cantor v. Berkshire Life Ins. Co., 171 Ohio St. 405, 171 N.E.2d 518 (1960); Psutka et al. v. Michigan Alkali Co. et al., 274 Mich. 318, 264 N.W. 385 (1936); Wilson v. Rudolph Wurlitzer Co., 48 Ohio App. 450, 194 N.E. 441 (1934); Schofield v. Zion's Cooperative Mercantile Inst., 85 Utah 281, 39 P.2d 342, 96 A.L. R. 1083 (1934); 45 Iowa L.Rev. 656 (1960); 56 Colum.L.Rev. 251 (1956); 23 U.Chi.L.Rev. 96 (1955); 53 Harv.L.Rev. 1375–1384 (1940); 34 Mich.L.Rev. 420 (1936); WILLISTON ON CONTRACTS, § 130B (3d ed. 1957).

United's obligation to the pensioners was assumed by the Debtor for a consideration of $400,000. United, however, desiring to protect itself from the obligation of making the pension payments in the event of a default by the Debtor, en-

The Debtor further agreed to pay (deferred) compensation of $15,000 per year for ten years to Russell Hunsinger, the president and general manager of the seller, who assumed similar duties with the Debtor, upon termination of his employment. In the event of Hunsinger's death, payments were to be made to his estate. He terminated his employment on February 1, 1966, and thus became eligible to receive $15,000 per year beginning in January of 1967. United guaranteed the Debtor's obligation to Hunsinger, and the Debtor pledged securities having a value of about $75,000 to United as partial security for guaranteeing the payment.[4]

Some time after taking possession, the Debtor loaned $1,499,435 to its parent company, Kerr's Inc.[5] This transaction depleted the Debtor's working capital and led directly to its financial difficulties.[6]

The loan apparently was inadequate, however, to the solution of the financial problems of the parent, and on February 14, 1966, Kerr's Inc. and its subsidiaries, including the Debtor, filed a petition in the United States District Court of the Southern District of New York seeking a Chapter XI reorganization. Each corporation alleged it was unable to pay its debts as they matured. Upon application of three unsecured creditors of the Debtor and United, the New York District Court for the Southern District ordered that the proceedings with respect to the Debtor (Emporium) be transferred to Minnesota. In re Kerr's Inc., 253 F.Supp. 742 (S.D.N.Y.1966), aff'd 360 F.2d 163 (2d Cir. 1966).

On May 17, 1966, the Debtor filed its proposed Plan of Arrangement and, on June 22, 1966, the Referee in Bankruptcy determined that the Plan had been accepted by a majority of the creditors.[7]

The Plan of Arrangement provided that the claims of unsecured creditors as of February 12, 1966, were to be liquidated, satisfied and discharged in full according to one of two options:

(1) By the payment of 100% of each claim, payable 50% in cash upon confirmation and the balance of the 50% to be paid in five equal annual installments of 10% each, the first installment payable January 15, 1968, and on the fifteenth day of January in each year thereafter until paid, or

(2) By the payment of 70% of the respective claims in full settlement and discharge of the claims, payable in cash upon confirmation.

tered into the security agreements outlined in the text of the opinion. United thus has the same rights as the pensioners to reject the confirmation of the Plan of Arrangement.

4. The February 12, 1966, financial statement prepared by the accountant for the Creditors Committee established a liability of $169,000 for the unsecured portion of the pension and Hunsinger claims. See Appendix A.

5. Kerr's, Incorporated, is a Delaware corporation licensed to do business in New York. It operates two large retail stores in Oklahoma and owns all of the stock of four other retail stores, including the Debtor, which are located in Illinois, Kansas and Minnesota. Kerr acted as the policy director for the entire organization, working from a small office of four rooms at 11 West 42nd Street, New York, New York. Its staff of five employees received all the money of each corporation and distributed the same.

6. Commenting on the loan, the Referee in Bankruptcy, at page 112 of the hearing transcript of August 23, 1966, stated:

"I have taken into account the management of this corporation in considering feasibility. Management appeared to be capable. There is testimony that this management will continue. It has made some errors of judgment in the past, the worst of which was the loan to the parent company, Kerr's, of funds of the Emporium for $1,500,000, or thereabouts. Without this loan, this company would not have been in financial trouble."

7. The Referee amended the Plan of Arrangement to delete a requirement that its approval was contingent upon the acceptance and confirmation of the Plan of Arrangement of the parent corporation and the other subsidiaries.

No mention was made in the proposed Plan of Arrangement of the Debtor's obligation under the lease, the pension agreement, or the Hunsinger agreement.[8]

A confirmation hearing was set for June 23, 1966, but was subsequently postponed until July 18, 1966. The Creditors Committee, at the opening of the July 18th hearing, moved that the Debtor be adjudicated a bankrupt on the ground that it had failed to make the required deposit. Another creditor joined in the motion upon the ground that the Debtor-in-Possession had sustained operating losses during the month of June amounting to approximately $154,000. The Referee in Bankruptcy denied the motions and postponed the confirmation hearing until August 22, 1966.[9]

Prior to the August 23rd hearing, the appellants filed objections and supplemental objections to the Plan of Arrangement on the grounds that it was neither feasible nor in the best interest of the creditors. The Debtor answered that the appellants were not creditors and were without a provable claim, and, therefore, not interested parties entitled to object to the confirmation of the Plan. The Referee reserved his ruling on the standing issue and permitted testimony to be presented as to whether the Plan was feasible and in the best interest of the creditors.

The Referee, after a two-day hearing, confirmed the Plan. At the conclusion of the hearing, he stated:

"The court has grave doubts as to its ruling that United Properties has status to appear and object to the plan of arrangement on file herein, and which has since been amended.

"The court has allowed the objector to proceed in the interest of all concerned, because further delay in this proceeding would be to the irreparable (sic) damage of all concerned in this matter."

He went on to hold that (1) the Plan was feasible and in the best interest of the creditors, (2) the leases were affirmed, and (3) the Debtor would be required to make payments to the pensioners and Hunsinger as they came due.

A petition for review of the Referee's order confirming the Plan, as amended, was filed on behalf of United and Hans Bosgard,[10] and a hearing was held before the Honorable Miles W. Lord, Judge of the District Court, on September 19, 1966, at which time the appellants' standing was again questioned by the Debtor and the Creditors Committee. The court deferred ruling on the standing issue and permitted the appellants to present evidence on the questions of whether the Plan of Arrangement was feasible and in the best interest of creditors.

8. Under the Plan of Arrangement, all of the issued capital stock of the Debtor, endorsed in blank, and the undated resignations of the officers and directors of the corporation, were to be delivered by the Debtor to the attorney for the Creditors Committee as security and returned to the Debtor upon payment of all of the promissory notes of the Debtor.

9. At the postponed hearing of July 18, 1966, it was pointed out that $700,000 of the $1,080,00 deposit, required under the Plan of Arrangement, had not been made. The Creditors Committee stated that they had waived the requirement that the $700,000 be deposited in cash and had accepted a commitment from the Commercial Discount Corporation to advance the

$700,000 upon an assignment of Accounts Receivable in this amount whenever directed by the Referee. The Referee declared that it was impractical to borrow the money before it was required and thus pay unnecessary interest. He required that the Debtor obtain a letter of intent from the Commercial Discount Corporation. Final distribution was not made to the creditors until December 21, 1966.

10. Hans Bodsgard, one of the pensioners, covered by the agreement between United and the Debtor, contended that he had an undisputed claim against the Debtor for a monthly pension in the amount of $150.00 per month for the rest of his life.

On September 19, 1966, the District Court entered its Findings of Fact and Conclusions of Law and Order affirming the Plan of Arrangement. The court stated:

(1) The Referee's Findings of Fact are supported by the testimony and exhibits offered in evidence at the hearings held July 18, August 22, and August 23, 1966.

(2) Additional evidence concerning the Debtor's position, subsequent to the confirmation of arrangement, did not substantially alter or affect the Referee's Findings of Fact, nor affect or impeach the reasonableness of the conclusions of the Referee drawn therefrom.

(3) While neither the Referee nor the court could guarantee the future commercial success of the Debtor, the evidence gives reasonable indication that there is a present probability of success.

The court concluded that (1) "the findings of fact of the Referee are not clearly erroneous and the conclusions of the Referee therefrom that the Plan of Arrangement is feasible and in the best interests of the creditors is reasonable;" and (2) "the finding of the Referee that the Plan of Arrangement adequately dealt with and provided for the pensioners, including Russell Hunsinger, is reasonable and not clearly erroneous."

On October 4, 1966, United and Hans Bodsgard appealed the order of the District Court to this Court. Thereafter, the appellees filed a motion to dismiss this appeal.

Meanwhile, proceedings leading to finalization of the Plan of Arrangement continued. On September 20, 1966, the Debtor filed a petition with the Referee requesting that the claims of United, as they related to the lease, the pensions and Hunsinger, be expunged and that the same action be taken with respect to the Bodsgard pension claim. On October 20, 1966, the Referee issued an order expunging the pension and the Hunsinger, and Bodsgard claims.[11] The appellants filed a petition for review of the Referee's order. The District Court entered its order affirming the Referee's order on November 29, 1966. No further appeal was taken.

Two major questions are presented to this Court on appeal: (1) Is the order confirming the Plan of Arrangement for the Debtor subject to review by this Court? (2) If subject to review, is the order so clearly erroneous that it ought to be set aside by this Court?

(1) *The order confirming the Plan of Arrangement is subject to review by this Court.*

■ The Referee and the lower court decided, albeit reluctantly, that the appellants had standing to object to the confirmation of the Plan of Arrangement. While no cross-appeal was taken from this decision by the appellees, we will, nevertheless, consider the standing issue as being properly before us.[12]

■ At the outset, it must be noted that the Referee had an obligation to make a careful study of the Plan of Arrangement, and to make an informed and independent judgment as to whether the Plan was in the best interest of creditors

---

11. The parties stipulated that the claims relating to the lease agreement could be expunged without the creditors waiving any right to participate in any future distribution should the Debtor be adjudicated a bankrupt.

12. While the decisions on the obligation of an appellee to file a cross-appeal are rare, the better view would appear to be that an appellee can assert any grounds on appeal that were asserted in the lower court that do not enlarge or extend its rights. Standard Accident Ins. Co. v. Roberts, 132 F.2d 794 (8th Cir. 1942); 3A Barron & Holtzoff § 1572 (1958). Thus in the present case, the appellees, having raised the standing issue before the Referee and the District Court, have the right to raise the issue here. Permitting them to do so does not enlarge upon any of their previously held rights.

and was feasible.[13] National Surety Co. v. Coriell,[14] 289 U.S. 426, 436, 53 S.Ct. 678, 77 L.Ed. 1300 (1933); Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 114, 60 S.Ct. 1, 84 L.Ed. 110 (1939); Sophian v. Congress Realty Co., 98 F.2d 499 (8th Cir. 1938). This responsibility existed even though no objections were filed by the creditors.

The appellants contend that as creditors materially and adversely affected by the Plan of Arrangement, they had a right to appear at the confirmation hearing and object to the Plan being confirmed by the Referee, and to appeal from an adverse decision in this matter.

The appellees concede that the appellants had a right to appear at the confirmation hearing and object to the Plan of Arrangement, but argue that once the executory contracts—the lease, the Hunsinger agreement and the pension agreement—were affirmed by the Debtor and that such affirmation was made a part of the Plan of Arrangement, the appellants were no longer creditors and thus had no further right to object to the Plan of Arrangement or to appeal from the decision confirming the Plan.

The appellees urge Mohonk Realty Corporation v. Wise Shoe Stores, Inc., 111 F.2d 287 (2d Cir. 1940), and In re Greenpoint Metallic Bed Co., 113 F.2d 881 (2d Cir. 1940), as supporting this view.

We do not consider either case as going to the point at issue.

In Mohonk, a plan of reorganization under Section 77B, 11 U.S.C.A. § 207, was approved by the District Court. The appellant's lease was neither adopted nor rejected by the Debtor. The plan of re-organization provided for the lease to be assigned to the new corporation, organized under the Plan, unless it was rejected by the Debtor. The Plan was confirmed without protest from the appellant, who did not appeal from the order confirming it. When the appellant learned that the Plan of Arrangement provided for a simple assignment of the lease and that the Debtor could move out any time it saw fit, it moved to vacate the order approving the reorganization and to modify the Plan, the time for appeal having expired.

The Second Circuit, in resolving the issues in Mohonk, held that it was within the lower court's discretion to grant or deny the appellant's motion and that it found no abuse of that discretion. It went on to state at page 290 of 111 F.2d:

"Appellant urges further that as a landlord whose lease was not rejected, it was unable to file a claim and hence had no right to be heard at the confirmation hearing. * * * we are satisfied that appellant had the right to be heard and the right to share in the reorganization plan. A landlord may not be a creditor with a provable claim until his lease is rejected, but under Chapter X his lease can be rejected by the terms of the plan itself [section 77B, sub. b(6), 11 U.S.C.A. § 207, sub. b(6); Chap. X, § 216(4), 11 U.S.C.A. § 616(4)], and at such time he becomes a creditor with a provable claim. Section 77B, sub. b, 11 U.S.C.A. § 207, sub. b; Chap. X, § 202, 11 U.S.C.A. § 602. A landlord is entitled to insist that his lease be either rejected or fully assumed under the plan, and he must appear in the reorganization court at the confirmation hearing or before, in or-

13. Section 361 of the Bankruptcy Act provides that if a plan has been *accepted in writing by all creditors* affected thereby, it must be approved if the court is satisfied that the arrangement and acceptance are in good faith and have not been procured by means, promises or acts forbidden by the Bankruptcy Act. See 11 Colliers on Bankruptcy, § 361 (14th ed. 1966). In such event, the Referee would be relieved of his responsibility to deter-mine whether the Plan had a reasonable chance of success.

14. The Supreme Court, in discussing the responsibility of a Referee in Bankruptcy, under § 77(b), at page 436 of 289 U. S., at page 682 of 53 S.Ct., stated:
"* * * Every important determination by the court in receivership proceedings calls for an informed, independent judgment. * * *"

der to assure adequate protection for his interests. * * * Having failed to protest, appellant is bound as a 'creditor' by the order confirming the plan. * * *"

*Mohonk* is clearly authority for the right of a landlord, or another holder, of an executory contract to participate in a confirmation hearing. It is not authority for the proposition that the holder of an executory contract is limited at such hearing to the right to insist that the executory contract be accepted or rejected by the Debtor, nor is it authority for the view that, if accepted, the holder of the executory contract has no right to question the ability of the Debtor to perform.

In *Greenpoint*, supra, the appellant was in the employ of the Debtor under a written contract providing for a term of service at a stipulated weekly rate. On December 13, 1939, the Debtor filed a petition for an arrangement under Chapter XI which provided for the transfer of the assets to a new corporation who was to pay all unsecured creditors 20% of their claims. Neither the Debtor's petition nor the proposed arrangement mentioned the employees' contract, and the employee was informed of these facts. The employee was notified that the last date for filing of claims was January 4, 1940, but filed no claim.

Thereafter, on January 16th, the employee filed a motion asking for an adjudication that his contract was in full force and effect, and survived the arrangement; or, as an alternative, that confirmation be stayed pending a determination of the status of his contract and the claims thereunder. The Referee denied the employee's motion. The employee appealed and the District Court affirmed. Meanwhile, the Plan of Arrangement had been confirmed and the employee sought no review of the order of confirmation.

In discussing the appellant's motion, the *Greenpoint* Court, at pages 883–884, said:

"* * * discussion must start upon the premise that Ratner had a valid executory contract with the debtor when its petition was filed.

* * * * * *

"* * * If an arrangement may tacitly reject an executory contract, we think the debtor's arrangement did so. In that event Ratner thereupon became a creditor and, having full knowledge of the facts, he had ample time to file his claim as such before expiration of the bar order on January 4th. But we are constrained to believe that the statute does not authorize a tacit rejection of an executory contract. * * * Consequently, no rejection had occurred prior to January 4 and Ratner was not a creditor to whom the bar order applied.

"Before confirmation of the arrangement he brought on his motion to fix his status under his contract with the debtor. This motion was timely, and the referee should have ordered the contract to be rejected and should have fixed a time for proving the claim arising from such rejection. Section 369(3). * * * As Ratner did not appeal from confirmation of the arrangement he cannot attack that order; but since there happens to be an excess deposit still within the court's control, we see no reason why he may not still be allowed to prove the damages resulting from rejection of his contract and receive a payment of 20 per cent. thereof out of the excess deposit. * * *"

*Greenpoint* is authority for the proposition that an executory contract must be expressly affirmed, and that in the absence of such affirmation, it is rejected. It also indicates that the holder of such a contract should assert his rights at the confirmation hearing before the Referee, and appeal from the confirmation order if dissatisfied; and that failing to do so, absent the special circumstances found in *Greenpoint*, cannot assert his rights in a subsequent motion.

Like *Mohonk*, however, *Greenpoint* does not attempt to settle the question of the right of the holder of such a contract

to object to a Plan of Arrangement which affirms his contract.

■ While Chapter XI does not specify who may and who may not object to the confirmation of a Plan of Arrangement, it is our judgment that the holder of an executory contract which has been fully performed by him is clearly a person who may be materially or adversely affected by the confirmation of a Plan, and thus has a right to be effectively heard in opposition thereto, and to appeal from an adverse decision in the matter.

The reasons for this point of view are well stated by Professor Davis in his treatise on Administrative Law:

> "The reasons in favor of permitting a challenge of governmental action by one who is in fact adversely affected by that action are very powerful. The strongest reason is the principle of elementary justice that one who is in fact hurt by illegal action should have a remedy. The second reason is that the artificiality and complexity of the law would disappear if the courts would follow the simple idea that one who is in fact hurt may challenge; the large amount of litigation over the unnecessary complexities of the law of standing is wasteful. * * *" 3 Davis, Administrative Law Treatise § 22.02 (1st ed. 1958).

While Professor Davis was addressing himself to the problem of judicial review of Administrative decisions, this reasoning can as well be applied with validity to the instant proceeding. See also Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); City of Chicago v. Atchison, Topeka & Santa Fe Ry. Co., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958).

■ Such is clearly the case with respect to the executory contracts relating to the pensioners and Hunsinger. They had performed the services required to earn their pensions or deferred compensation. They had retired believing that these payments would be made. To hold

that they, or United standing in their place, had no right to protest a Plan under which merchandise and service creditors would receive a minimum of 50% cash payments, and leave an empty shell to fulfill their contracts, would be inequitable and contrary to the spirit of Chapter XI of the Bankruptcy Act.

■ The appellees further contend that whatever rights the appellants may have had to object to the confirmation of the Plan of Arrangement were lost to appellants by their failure to appeal from the Referee's order expunging the claims. The order stated in part:

> "1. That claims number 892, 894, and 895 have been dealt with under the plan of arrangement as confirmed by the Court on August 23, 1966, that said plan of arrangement is res judicata as to those claims. That under the plan, all of those claims are regarded as pension claims and the Court has already ordered that Emporium Department Stores, Inc. is to pay the pension claims as they became due.

> "2. That claims numbered 892, 894 and 895 as listed on Exhibit A attached hereto are hereby ordered expunged."

This order merely reaffirmed what had previously been decided by the Referee's order of August 23, 1966, from which the appellants had already properly appealed. See Kelso v. Maclaren, 122 F.2d 867 (8th Cir. 1941); Triangle Electric Co. v. Foutch, 40 F.2d 353 (8th Cir. 1930); In re Pechin, 227 F. 853 (3d Cir. 1915); In re Chotiner, 218 F. 813 (3d Cir. 1914); 2 Collier on Bankruptcy § 24.39 (14th ed. 1966). It had the effect of removing the contested claims from the register from which the distribution was to be made, but in no way affected the appeal already pending.

(2) *Was the order of the Referee confirming the Plan so clearly erroneous that it ought to be set aside by this Court?*

■ We come now to the question of whether the decision of the Referee in Bankruptcy, that the Plan of Arrangement was feasible and in the best interest

of creditors, was clearly erroneous.[15] 11 U.S.C.A. § 766(2). Judge Blackmun, writing for this Court, in O'Rieley v. Endicott-Johnson Corporation, 297 F.2d 1, 6 (8th Cir. 1961), stated the test to be applied in determining whether a decision was clearly erroneous:

" * * * whether, although there is supporting evidence, 'the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed,' * * *."

See Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Magidson v. Duggan, 212 F.2d 748, 752 (8th Cir. 1954);[16] Kasper v. Baron, 207 F.2d 744, 748 (8th Cir. 1953); Pendergrass v. New York Life Ins. Co., 181 F.2d 136, 138 (8th Cir. 1950); Kauk v. Anderson, 137 F.2d 331, 333 (8th Cir. 1943); Aetna Life Ins. Co. v. Kepler, 116 F.2d 1, 5 (8th Cir. 1941).

■ In determining whether the Plan of Arrangement is feasible, the bankruptcy court has an obligation to scrutinize the Plan carefully to determine whether it offers a reasonable prospect of success and is workable. Judge Sanborn, of this Court, in commenting on the Referee's responsibility in matters of this nature, stated:

"The court also erred in assuming that if, upon its face, the plan proposed appeared to be feasible, it was to be approved unless the objecting creditors could show that it was not feasible.

* * * * * *

"Even if a large majority of the creditors had approved the plan, that would be of no avail to sustain it. In re Barclay Park Corporation [2 Cir., 90 F.2d 595], supra; First National Bank of Cincinnati v. Flershem, 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465, 90 A.L.R. 391; In re Day & Meyer, Murray & Young, Inc., supra [2 Cir., 93 F.2d 657], page 659. *It was vitally important that the court should be fully and accurately informed by reliable evidence as to the value of the property with which it was dealing,* and not obliged to rely entirely on expert evidence produced by the proponents of the plan. Jamieson v. Watters, 4 Cir., 91 F.2d 61, 63." Price v. Spokane Silver & Lead Co., 97 F.2d 237, 245 (8th Cir. 1938). (Emphasis added.)

At page 246, Judge Sanborn continued:

"*In order to acquire knowledge of the financial, management and business history of a concern; of the extent, character and condition of both assets and liabilities; of the past, present and probable prospective earnings and expenses, and of whether a plan proposed offers a reasonable prospect of success and is workable, there must be competent, definite, concrete, and reliable evidence from which such facts may be ascertained by the court.* * * *" (Emphasis added.)

---

15. Additional evidence concerning the position of the Debtor subsequent to the date of confirmation was received by the United States District Court on petition for review. The court specifically found that the additional evidence did not substantially alter or affect the findings of fact of the Referee, nor the reasonableness of the conclusions of the Referee drawn therefrom. We are not, therefore, concerned with the question of whether the clearly erroneous standard is to be applied to the decision of the Referee or to the decision of the District Court. See O'Rieley v. Endicott-Johnson Corporation, 297 F.2d 1 (8th Cir. 1961).

16. In this case, Judge Sanborn, at pages 752–753, stated:

"The immediate question is whether the findings of the District Court are clearly erroneous. The findings of fact of a trial court are clearly erroneous within Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A., when (1) not supported by substantial evidence, (2) contrary to the clear preponderance of the evidence, or (3) based upon an erroneous view of the law. Aetna Life Insurance Co. v. Kepler, 8 Cir., 116 F. 2d 1, 5; Kasper v. Baron, 8 Cir., 207 F.2d 744, 748."

The appellants, however, ask us to apply a narrower rule of feasibility—one to the effect that the feasibility of a Plan is established by the fact that the confirmed Plan is fulfilled. In support of this proposition, they cite In re American Trailer Rentals Company, 325 F.2d 47 (10th Cir. 1963), and In re Slumberland Bedding Co., 115 F.Supp. 39 (D.C. Md.1953). In each of these cases, the Plan of Arrangement provided that unsecured creditors were to be paid in cash on confirmation and were not to receive any other consideration; thus it was possible for the Referee to determine that the Plan had been fulfilled on the date of confirmation. In this case, the Plan would be fulfilled only when all payment due under it had been made.

Since two hundred and forty-seven unsecured creditors, having claims in the amount of $468,000, accepted the option of being paid 50% of their claim over a period of five years, the Plan would not be fulfilled as to them until the five-year period passed. If we also considered the Hunsinger and pension claims, the period of fulfillment would be even longer.

Judge Medina, in In re Transvision, Inc., 217 F.2d 243 (2d Cir. 1955), at page 246, stated: [17]

"* * * The feasibility of the arrangement must be examined with a view toward determining whether, in the absence of the elaborate procedures provided for by Chapter X, and considering the debt and corporate structure of the particular petitioner, there is a reasonable likelihood that the desired financial recovery will be effected without unduly prejudicing the rights of any interested parties. * * *

"The Supreme Court has declared that this determination as to the adequacy of the relief afforded by Chapter XI is one within the purview of the district court's discretionary exercise of its equity powers, Securities Commission v. U. S. Realty Co., supra, 310 U.S. [434] at page 456, 60 S.Ct. 1044, [84 L.Ed. 1293] and unless the petitioner's corporate and financial condition is demonstrably such as to indicate that the district court has abused that discretion, its determination should be sustained."

See In re Llewellin, 86 F.2d 588, 590 (7th Cir. 1936); In re Pressed Steel Car Co. of New Jersey, 16 F.Supp. 329, 339 (W.D.Penn.1936).

Thus the basic question is—did the Debtor have a reasonable chance of success? After reviewing the evidence in its entirety, we are left with the definite and firm conviction that the Referee's finding of feasibility was clearly erroneous. While we share the Referee's concern for maintaining an established business that furnished employment to more than a thousand employees, and while we are convinced that the Referee's decision was made in good faith and under difficult circumstances, we are unable to find justification in the record for holding that the Debtor had a reasonable chance for success under the Plan of Arrangement confirmed by the Referee.

While financial statements of the Debtor for the period February 12, 1966, through August 27, 1966, were introduced into evidence by the appellants, neither the Debtor nor the Creditors Committee prepared a projection of future earnings or cash flow other than for the last four months of 1966, nor was an independent appraisal of the inventory, the Accounts Receivable or other assets introduced into evidence. It thus is clear that the record does not contain the competent, concrete and reliable evidence envisioned by Judge Sanborn as being essential to an informed decision.

A composite summary of the current assets and liabilities of the Debtor, taken

17. Judge Medina was addressing himself to the problem of whether a proceeding should properly be brought under Chapter X or Chapter XI of the Bankruptcy Act when he used this language. But the principle he expressed is applicable here.

from the Debtor's financial statements for the dates shown, is set forth below as an aid in understanding the discussion of feasibility that follows: [18]

| | Feb. 12, 1966 | Jul. 30, 1966 | Aug. 27, 1966 | Aug. 27, 1966 Adjusted for Confirmation |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current Assets** | | | | |
| Cash | $ 158,000 | $ 481,000 | $ 493,000 | $ 31,000 |
| Net Accounts Receivable | $ 763,000 | $1,049,000 | $1,094,000 | $ 319,000 |
| Inventory at Cost | $1,940,000 | $1,240,000 | $1,190,000 | $1,190,000 |
| Other | $ 176,000 | $ 200,000 | $ 204,000 | $ 204,000 |
| Total | $3,037,000 | $2,970,000 | $2,981,000 | $1,744,000 |
| **Liabilities** | | | | |
| **Current Liabilities** | | | | |
| Accounts Payable | $1,779,000 | $2,391,000 | $2,560,000 | $ 886,000 |
| Accrued Expenses | $ 468,000 | $ 348,000 | $ 343,000 | $ 305,000 |
| Other | $ 12,000 | $ 110,000 | $ 115,000 | $ 162,000 |
| Legal & Accounting Fees & Expenses | | | | $ 116,000 |
| Total | $2,259,000 | $2,849,000 | $3,018,000 | $1,469,000 |
| **Assuming Inventory at Cost:** | | | | |
| Ratio | 1.34 to 1 | 1.04 to 1 | .98 to 1 | 1.19 to 1 |

The Referee's decision that the Plan of Arrangement was feasible was based on his finding that: (1) the ratio of current assets to current liabilities was two to one, (2) the Debtor was solvent, (3) the Debtor's capital structure was adequate, (4) the business could be operated at a profit, (5) the cash flow was satisfactory, (6) management was capable, and (7) economic conditions were satisfactory.

These findings are clearly erroneous:

(1) *The ratio of current assets to current liabilities was substantially less than two to one.*

Financial statements prepared for the Creditors Committee and by the Debtor showed the ratio of current assets to current liabilities as:

| | Column 1 Assuming Inventory Valued at Cost | Column 2 Assuming Inventory [19] Valued on Adjusted Basis |
|---|---|---|
| February 12, 1966 | 1.34 to 1 | .64 to 1 |
| July 30, 1966 | 1.04 to 1 | .69 to 1 |
| August 27, 1966 (Before Confirmation) | .98 to 1 | .66 to 1 |
| August 27, 1966 (Adjusted for Confirmation) | 1.19 to 1 | .53 to 1 |

18. A more detailed, consolidated statement is attached to this decision as Appendix B.

19. The adjusted figures shown in Column 4 are necessarily estimates, for no post-confirmation statement was received in

The Debtor was unable to meet its bills as they came due in February of 1966, when its ratio of current assets to current liabilities was 1.34 to 1. This ratio was not improved during the period prior to confirmation. In fact, as of August 27th, the ratio (assuming the facts most favorable to the Debtor) had been reduced to .98 to 1. Even after $1,088,000 in Accounts Payable was discharged or deferred by the confirmation, the ratio 1.19 to 1 was less than when the original petition was filed on February 12, 1966.

It is obvious that the ratio of current liabilities to current assets is dependent on the value of the inventory.[20] No appraisal of it was made, but even if it be conceded that the higher value (cost) is realistic, the ratio was nowhere near the two to one ratio found by the Referee.[21]

The inventory was reduced by more than $750,000 between February 12th and August 27th, through a series of inventory reduction sales undertaken to raise the funds necessary to make the deposit necessary to secure confirmation of the Plan of Arrangement. That the most salable merchandise was the first to be sold is clearly indicated by the fact that as the sales continued, progressively lower prices were necessary to move the remaining merchandise off the shelves and convert it into cash. The extent of price reductions necessary to accomplish the Debtor's objective of liquidating its inventory is shown by the drop in gross profits as the months passed and the "inventory reduction sales" continued. Thus the gross profits were: May, 31%; June, 23%; July, 15%; August, 10%. By August, the Debtor was literally selling the merchandise at cost to meet the confirmation deadline of August 23, 1966. Under such circumstances, it is

evidence. The validity of the ratios of current assets to current liabilities is indicated, however, by exhibits filed in a subsequent bankruptcy proceedings described below.

On February 27, 1967, six employees of the Debtor filed a petition in involuntary bankruptcy asking that the Debtor be adjudged a bankrupt. Shortly thereafter, the stores operated by the Debtor were closed. A second petition in involuntary bankruptcy was filed on April 14, 1967. A hearing on the first petition was still in progress at the time this decision was issued. Financial statements of the Debtor, for the months of September, 1966, through February of 1967, were received in evidence in that proceeding. The ones of November, 1966, and February, 1967, are attached hereto as Appendix C.

(1) The Debtor's statement of November 26, 1966, is the first of these reflecting the position of the Debtor after confirmation. It showed:

Current Assets .......... $2,375,000
Current Liabilities ........ $2,148,000
Ratio of Current Assets to
Current Liabilities ...... 1.1 to 1

(2) The statement for February 25, 1967, showed:

Current Assets .......... $1,655,000
Current Liabilities ....... $1,366,000
Ratio of Current Assets to
Current Liabilities ...... 1.2 to 1

(3) The financial statements from September, 1966, through February, 1967, show that the Debtor lost a total of $486,000 during the period. December was the only profitable month, when a profit of $65,000 on sales of $1,764,000 was achieved.

(4) The inventory during the same period ranged from a high of $1,170,000, on October 29, 1966, to a low of $855,000 on February 25, 1967.

**20.** The C.P.A., selected by the Creditors Committee, showed the inventory as having the adjusted value set forth in Column 2. This was based on a plan established by the Debtor of establishing an inventory reserve—based on a last-in, first-out formula. It, undoubtedly, undervalues the inventory.

**21.** The only testimony in the record supporting this finding by the Referee was the statement of Irving Eisen, Vice President and treasurer of the Debtor, who testified that upon confirmation, the Debtor's ratio of current assets to current liabilities would be better than two to one. Eisen based his conclusion on the assumption that current assets would be about $2,000,000 upon confirmation, and current liabilities would be in the neighborhood of $800,000 at that date. The record shows clearly that in so testifying, he failed to take into consideration operating losses of $455,000 in July and August. As a result of these losses and other facts which Eisen failed to consider, current liabilities were in excess of $1,450,000.

difficult to believe that the inventory remaining after August 23rd could be realistically valued at cost.

The remaining current assets (as per the pro forma statement of August 23rd) consisted of: $31,000 in cash, one-half the sum necessary to meet the internal everyday needs of the Debtor; $204,000 of "Other Current Assets" consisting primarily of prepaid items, none of which could be used by the Debtor to generate additional working capital; and an equity of $371,000 in Accounts Receivable (More than 85% of the Accounts Receivable of $2,741,000 having been previously pledged to raise funds necessary for the confirmation deposit and to cover the losses of $739,000 from February through August.).

Even though more than $1,674,000 in current liabilities were discharged or deferred under the Plan of Arrangement, the Debtor's current liabilities after confirmation were at least $1,469,000, and the ratio of current assets to current liabilities was no higher than 1.2 to 1, substantially and critically less than the 2 to 1 ratio found by the Referee.

(2) *The solvency of the Debtor is questionable.*

The Referee based his finding that the corporation was solvent on the asumption that the total assets of the corporation would exceed its total liabilities upon confirmation. This finding can be sustained only if: (1) the value of the inventory is equal to its cost, (2) the obligation of $750,000 due from the parent is collectible, and (3) a contingent liability in the sum of $355,000 is disregarded.[22]

In the absence of any evidence to justify the value of the inventory at cost, and with the value of the parent's obligation being dependent on confirmation of a Plan of Arrangement (which had not been obtained as of August 23rd), and with there being no assurance that the Debtor would not be called upon to pay the contingent liability, the finding of solvency by the Referee is highly speculative.

(3) *The evidence fails to establish that the Debtor could operate at a profit.*

While testimony indicated that the business had been operated at a profit by the prior owners, it does not disclose the extent of that profit. The record is also silent as to the extent of profit for the fiscal year ending June 30, 1964. The record does show that in the first two full years that the business was operated by the Debtor, it lost $90,000 from July 1, 1964, to June 30, 1965, and $394,000 from July 1, 1965, to June 30, 1966.[23]

22. The former stockholders of Crosby Brothers, Inc., filed a proof of claim against the Debtor in the sum of $526,000. The original indebtedness had been incurred by the parent organization (Kerr's) when it purchased the stock of Crosby Brothers, Inc., for $1,203,000 in 1962. On September 30, 1963, Kerr's, in order to obtain the consent of the stockholders of Crosby Brothers to the sale of certain real estate owned by it, caused the Debtor and its other subsidiaries to execute their written guarantee of all payments required to be made.

In an agreement of August, 1966, in which the claim was compromised for $355,000, Kerr's and its subsidiaries, including the Debtor, granted to the Crosby's as collateral security for its obligation, a security interest in the outstanding stock of the Debtor which was subject to the rights of the Creditors Committee. It is assumed that the Crosby claimants are now holding the capital stock of the Emporium as collateral for the repayment of the $355,000.

The Crosby claim in the sum of $355,000 was allowed after an ex parte hearing by the Referee. It was subordinated, however, to the claims of the 50% and 70% creditors. The appellants petitioned the Referee requesting that the order be vacated. The Referee denied the appellants' petition on the grounds that the appellants were not aggrieved persons. The appellants' petition to the District Court for review of the Referee's order was denied. The effect of the Referee's decision was to subordinate the Crosby claim to the 50% and 70% creditors, and to give them an advantage over the appellants.

23. If a LIFO reserve is included, a profit of $82,000 resulted for 1964–65; and if it is included for 1965–66, the loss was reduced to $335,000.

The record is not sufficient to indicate the validity of including the reserve.

It also establishes that losses in 1966 were continuous and increasing. Thus, from February 14, 1966, to August 27, 1966, the losses aggregated $739,265. The monthly schedule of these losses is as follows:

| Period | Amount of Loss |
| --- | --- |
| 2/14/66—4 /2/66 (R 273) | $ 67,488 |
| 4/ 4/66—4/30/66 (R 274) | $ 24,646 |
| 5/ 2/66—5/28/66 (R 275) | $ 34,000 |
| 6/ 1/66—7/ 2/66 (R 209) | $157,453 |
| 7/ 3/66—7/30/66 (R 210) | $202,800 |
| 8/ 1/66—8/27/66 (R 296) | 252,878 |
| Total | $739,265 |

———◆———

In considering whether the Debtor could operate at a profit in the future, the Referee failed to take into consideration the fact that operating expenses to the Debtor would be substantially higher than they were prior to the time that the inventory was liquidated. The testimony is undisputed that an inventory of at least $2,000,000 is necessary to operate the store at a profit. To raise the inventory to this level, even assuming that the inventory had a current value of $1,190,000, an additional inventory of at least $800,-000 would be necessary. In view of the fact that the Accounts Receivable had already been substantially encumbered, the cash depleted, and no other current assets available to be converted into cash, either additional equity capital or long-term credit was required to accomplish this goal.[24]

While there is a good deal of loose talk in the record as to the availability of additional capital, there is no testimony from which one could reasonably assume that commitments, on which a reasonably prudent person could rely upon, had been made to furnish additional working capital. Thus long-term credit at reasonable terms was an absolute requirement.

While witnesses testified that this long-term credit would be available, they did not indicate the cost of obtaining it, nor from whom it would be obtained.

The Debtor was required to pay 12.3% interest to the Commercial Discount Corporation for money advanced on his Accounts Receivable. Experience dictates that inventory loans are at least as expensive. Assuming that inventory loans would be available and that they could be obtained for 12.3%, the additional costs to the Debtor would be nearly $100,000 per year.

(4) *The cash flow was inadequate.*

The Referee, in discussing cash flow, stated:

"Cash flow is one test that the court has taken into account and that the objector has indicated to the court that as not being adequate in this proceedings. There are many avenues, and the court will take judicial notice that there are many avenues that the solvent Debtor may take to increase his cash flow."

Even if we assumed the validity of its inclusion, the Debtor's ability to operate at a profit would not be reasonably shown.

24. The testimony of an expert witness for the appellants, that additional working capital in the form of an equity or long-term credit in the sum of $1,000,000, $1,-500,000 was necessary to insure the future success of this business, stands uncontroverted.

We find nothing in the record to justify the optimism of the Referee.

The amount of cash required to operate the business in the years immediately after confirmation would be substantially higher than it was during 1964 and 1965. The annual cash requirements would be increased as follows:

12.3% interest on $700,000 borrowed from C.D.C. to make the required deposit .........$ 86,000

12.3% interest on the additional $800,000 required to raise the inventory to $2,000,000 ..$ 96,000

Annual Payments to 50% creditors .....................$ 47,000
———
Total ..............$229,000

The additional $220,000 per year does not take into consideration the contingent liabilities to the Crosby's, which required payments in excess of $5,000 per month beginning January 1, 1968, or an additional $60,000 per year, the $116,000 due for legal and accounting fees by December 31, 1966, nor does the sum include payments on principal that would have to be made on the additional $1,500,000 borrowed on Accounts Receivable and inventory. Even if the Debtor were able to make arrangements to repay this sum over a period of ten years, the annual additional payments would be $150,000 a year. Thus the Debtor was faced with at least the strong possibility of having to make the following annual payments:

| | |
|---|---|
| Payments to 50% creditors | $182,000 |
| Interest on payments to 50% creditors | $ 47,000 |
| Contingent obligation | $ 60,000 |
| Payment to retired indebtedness | $150,000 |
| Total | $439,000 |
| Payment of legal and accounting fees (first year only) | $116,000 |
| | $555,000 |

———◆———

There is nothing in this record to indicate that the profits of this magnitude were foreseeable. While repayment of the Kerr loan in accordance with the proposed Plan of Arrangement would have relieved the cash situation somewhat—$375,000 the first year and $75,000 per year thereafter, such repayment would not be sufficient to give the needed cash flow.

It is thus apparent that this Plan of Arrangement could not reasonably hope to be successful without the injection of substantial equity capital or very long-term credit at substantially lower rates of interest than the Debtor was forced to pay under its present and proposed arrangements.

(5, 6) *The management was capable and economic conditions were satisfactory.*

While one might reasonably question the capability of the management that had led a successful corporation into financial difficulties, we cannot say that this finding of the Referee was clearly erroneous, nor is there evidence in the record to indicate that the Referee's finding that economic conditions were satisfactory is clearly erroneous.[25]

The sum and substance of the Debtor's problem is that it purchased an appar-

25. Even though the same local management team remained, it had been seriously handicapped by the new owner's deci- sion to take $1,500,000 in working capital out of the business in the form of a loan to the parent corporation.

ently successful business for $4,775,000. Shortly thereafter, it made a loan to its parent in the sum of $1,500,000, which loan the parent has not been able to repay and which seriously impaired the working capital position of the Debtor. As the Debtor attempted to improve its cash position by liquidating inventory and pledging Accounts Receivable, the gross profit was cut and operating expenses increased. The Plan of Arrangement proposed and confirmed by the Referee was not sufficiently realistic to arrest this trend. With no additional equity capital available and with the Debtor's statement of being unable to support long-term credit, the Debtor had no reasonable chance for success under the Plan of Arrangement proposed and confirmed.

Under these circumstances, the Plan of Arrangement was not feasible [26] and the decision of the Referee confirming it was clearly erroneous.

*The effect of distribution to creditors, and the failure of the appellants to request a stay.*

██ Two additional questions are raised by this appeal: (1) Does the fact that the distribution to creditors was made on December 21, 1966, affect the rights of the appellants on this appeal? (2) Does the failure of the appellants to request a stay of the order authorizing distribution affect their rights on this appeal?

We answer both questions in the negative.

The Referee in Bankruptcy, at the hearing on appellants' objection to the distribution to creditors, stated that the court would proceed with the distribution even though an appeal was pending. In so doing, the Referee relied on In re Lilyknit Silk Underwear Co., Inc., 73 F.2d 52 (2d Cir. 1934). The Referee stated:

" * * * if the confirmation is reversed by a higher Court, it will be the trustee's duty, if there ever be one, to recover from the payees the monies paid to them as a result of distribution, and to bring the money so paid back into the estate. This may involve a great deal of work on the part of the Court, but this Court has never dreaded, feared nor shunned work, and it expects its trustees to operate in the same way.

* * * * * *

"As to the argument that an appeal is pending to the Court of Appeals for the Eighth Circuit, I covered this previously and the Court takes judicial notice of the pendency of this appeal. The further argument has been made that the argument does not take into account the rights of certain parties. * * * If on appeal the Court finds that it has not protected the interest of certain parties, they will be protected under the *Lilyknit* decision, 73 [F.2d] 52, wherein the trustee will have to recover the monies paid out."

The appellees cite Marshall Field & Co. v. Wolf & Bros. Dry Goods Co., 120 F. 815 (8th Cir. 1903), to support the position that the distribution requires affirmation of the Referee's decision. In that case, a dissenting creditor appealed to decision of the bankruptcy court approving a composition for the benefit of the creditors. The assenting creditors were not made parties to the appeal. Funds were distributed to the creditors

---

26. In view of our holding that the Plan of Arrangement was not feasible, we will not discuss in detail whether it was in the best interest of creditors. The Plan was apparently in the best interest of those creditors accepting the 70% or the 50% option as they received more than they would have received under a liquidation. See Fleischmann & Devine, Inc. v.

Saul Wolfson Dry Goods Co., Inc., 299 F. 15 (5th Cir. 1924); In re Waynesboro Drug Co., 157 F. 101 (D.C.S.D.Ga.1907).

It is equally clear, however, that the payments were so generous that the Debtor had no reasonable chance to succeed, thus the probabilities were that the appellants would receive substantially less than if the business were liquidated.

before the appeal was perfected. This Court granted the appellees' motion to dismiss the appeal on the grounds that the assenting creditors should have been made parties to the appeal. In so doing, the Court, at page 816, stated:

"* * * The great body of the creditors having accepted the composition and received their money before this appeal was taken, the consequences of reversing the order of the court approving the composition would be very serious to them. *They would have to repay the money they have received, and incur the risk of receiving a less sum from the trustee.* It is very plain that the bankrupt does not represent the assenting creditors, and that their interests are such as to require that they should be made parties to the appeal." (Emphasis added.)

This Court, then, dismissed the appeal not because a distribution had been made but because the creditors had not been made parties to the appeal.

The appellees also rely on Technical Color & Chem. Wks. v. Two Guys from Massapequa, 327 F.2d 737 (2d Cir. 1964), in support of its position. In that case, the Court held that a distribution to creditors, after an appeal, did not render the appeal moot as the creditors stood to receive more, if the appellants' contention prevailed, rather than less. While this fact obviously lessened the problems on reversal, the Court did not indicate that affirmation of the lower Court's decision would necessarily result if the creditors received less rather than more on a reversal.

 The appellees also contend that since the appellants had a right to re-quest a stay of all proceedings upon filing its appeal, and since the Referee was empowered to grant one,[27] the appellants were required to request one.

The appellees go on to argue that the appellants, by failure to exercise their right to request a stay, have forfeited their right to relief in this Court. They paraphrase their argument thusly: "Appellants predicament is at least partly its own creation." No authority has been cited for this proposition. Neither the Federal Rules of Civil Procedure nor decisions of the Court require an appellant to make application for a stay. Rule 73 (d) of the Federal Rules of Civil Procedure provides that whenever an appellant, entitled thereto, *desires* a stay on appeal, he may present to the Court for its approval a supersedeas bond which shall be conditioned for the satisfaction of the judgment in full, together with cost, interest and damages for delay.

The Referee's decision to make a distribution, on the insistence of the Debtor and Creditors Committee, was made with full knowledge of the consequences of a reversal of the Referee's order.

The appellees also urge that even though the appellants did not have a legal obligation to apply for stay, their failure to do so ought to be considered by this Court as inequitable conduct on the part of the appellants which should be given weight by this Court in reaching its decision. We find no precedent for this view.

The appellees' motion to dismiss the appeal is denied, and this case is reversed and remanded to the lower court for action consistent with this opinion.

27. Magidson v. Duggan, 180 F.2d 473 (8th Cir. 1950); Continental Ill. N. B. & T. Co. v. Chicago, R. I. & P. R. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1934); In re Foley, 4 F.2d 152 (D.C. S.D.Cal.1924); and In re Standard Gas & Electric Co., 139 F.2d 149 (3d Cir. 1943).

## APPENDIX A.

## EMPORIUM DEPARTMENT STORES, INC.—DEBTOR

### Tentative Statement of Assets and Liabilities
### as at February 12, 1966

This Tentative Statement Has Been Prepared on a Going Concern Basis From the Books and Records of the Company and From Information Obtained From Management and Is Subject to Such Additional Adjustments as May Be Necessary Upon the Completion of and Examination Thereof by S. D. Leidesdorf & Co., Certified Public Accountants, Who, at This Stage in Their Examination, Are Not in a Position to Express an Opinion on This Tentative Statement.

### Assets

| | | |
|---|---:|---:|
| Cash | | $ 158,195 |
| Customers accounts receivable—substantially pledged as collateral for amount due to Commercial Discount Corporation—per contra | $ 3,352,793 | |
| Less: Allowance for doubtful accounts | 115,000 | $ 3,237,793 |
| Merchandise inventory at the lower of cost or market on the retail method | 1,940,213 | |
| Less: Reserve to reduce inventory to last-in, first-out basis | 1,589,328 | 350,885 |
| Other receivables, including vendors' debit balances of $21,863 | | 27,991 |
| Due from Kerr's, Inc. (parent company) | | 1,499,435 |
| Fixed Assets, at cost: | | |
| Furniture and fixtures | 130,656 | |
| Leasehold improvements | 283,074 | |
| | 413,730 | |
| Accumulated depreciation and amortization | 65,578 | 348,152 |
| Other assets and deferred charges: | | |
| Unexpired insurance—substantially pledged as collateral for notes payable—per contra | 65,072 | |
| Supplies | 55,274 | |
| Investments—at cost—plus accrued interest of $9,042—held in escrow pursuant to pension and deferred compensation agreements—per contra | 156,891 | |
| Deposits | 15,925 | |
| Miscellaneous | 12,522 | 305,684 |
| | | $ 5,928,135 |

## Liabilities

| | | |
|---|---:|---:|
| Due to Commercial Discount Corporation—per contra ..................................... | | $ 2,475,079 |
| Bank overdraft ................................ | | 12,104 |
| Accrued expenses and sundry liabilities: | | |
| Salaries and wages ...........................$ | 69,028 | |
| Employees' withholdings ...................... | 77,097 | |
| Taxes (Other than Federal income taxes) ..... | 162,586 | |
| Rent ........................................ | 92,955 | |
| Interest .................................... | 15,630 | |
| Unredeemed coupons and gift certificates ....... | 20,599 | |
| Legal and professional ........................ | 11,394 | |
| Other ....................................... | 18,729 | 468,018 |
| Notes payable—insurance—per contra ........... | | 33,446 |
| Accounts payable—trade ....................... | | 1,779,347 |
| Reserve for employee pensions—per contra ....... | | 295,732 |
| Deferred compensation payable—per contra ...... | | 150,000 |
| | | $ 5,213,726 |
| Excess of Assets over Liabilities ............... | | $ 714,409 |

## EMPORIUM DEPARTMENT STORES, INC.—DEBTOR

### Tentative Statement of Operations

### For the Period From August 1, 1965 to February 12, 1966

This Tentative Statement Has Been Prepared on a Going Concern Basis From the Books and Records of the Company and From Information Obtained From Management and Is Subject to Such Additional Adjustments as May Be Necessary Upon the Completion of an Examination Thereof by S. D. Leidesdorf & Co., Certified Public Accountants, Who, at This Stage in Their Examination, Are Not in a Position to Express an Opinion on This Tentative Statement.

| | | |
|---|---:|---:|
| Sales | | $10,011,615 |
| Less: Leased departments | | 2,790,788 |
| Sales—owned departments | | 7,220,827 |
| Cost of goods sold | | 4,803,281 |
| Gross profit on sales | | 2,417,546 |
| Leased department income | | 253,451 |
| | | 2,670,997 |
| Operating expenses less carrying charges | | 2,335,777 |
| | | 335,220 |
| Other income: | | |
| Reversal of excess provision of a prior year for doubtful accounts | $ 73,527 | |
| Miscellaneous | 7,953 | 81,480 |
| | | 416,700 |
| Other deductions: | | |
| Interest: | | |
| Intercompany | 125,899 | |
| Other | 1,870 | |
| Provision for deferred compensation | 77,500 | |
| Miscellaneous | 9,294 | 214,563 |
| Net income before items shown below | | 202,137 |
| Service charge from parent company | | 110,166 |
| Net income before adjustment of LIFO inventory | | 91,971 |
| Credit arising from reduction of LIFO inventory | | 58,331 |
| Net income | | $ 150,302 |

## APPENDIX B.

The Simplified Balance Sheet for February 12th, Is Based on an Unaudited Statement of Assets and Liabilities Prepared by S. D. Leidesdorf and Company, C. P. A.'s for the Creditors Committee. The Ones of July 30th and August 27th Are Based on Statements Prepared by the Debtor.

### Assets
#### Current Assets

| | Feb. 12, 1966 | Jul. 30, 1966 | Aug. 27, 1966 |
|---|---|---|---|
| Cash .................. | $ 158,000 | $ 481,000 D | $ 493,000 |
| Accounts Receivable .... ) | $3,238,000 | $2,782,000 | $2,741,000 |
| Less, Those Pledged to ) | | | |
| C. D. C. .............. ) | $2,475,000 | $1,733,000 | $1,647,000 |
| Net Accounts Receivable | $ 763,000 | $1,049,000 | $1,094,000 |
| Inventory at Cost ...... ) | $1,940,000 | $1,240,000 | $1,190,000 |
| Less, Reserve .......... ) | $1,589,000 | $1,017,000 | $ 975,000 |
| Adjusted Inventory ..... | $ 351,000 A | $ 223,000 | $ 215,000 |
| Other .................. | $ 176,000 | $ 200,000 | $ 204,000 |
| Total .......... | $1,448,000 | $1,953,000 | $2,006,000 |

#### Fixed Assets

| | Feb. 12, 1966 | Jul. 30, 1966 | Aug. 27, 1966 |
|---|---|---|---|
| Furniture, Fixtures and Leasehold Improvements ............... | $ 348,000 | $ 342,000 | $ 340,000 |
| Due from Parent ....... | $ 750,000 B | $ 750,000 | $ 750,000 |
| Total ......... | $1,098,000 | $1,092,000 | $1,090,000 |
| Grand Total .... | $2,546,000 | $3,045,000 | $3,096,000 |

### Liabilities
#### Current Liabilities

| | Feb. 12, 1966 | Jul. 30, 1966 | Aug. 27, 1966 |
|---|---|---|---|
| Accounts Payable ....... | $1,779,000 | $2,391,000 E | $2,560,000 |
| Accrued Expenses ...... | $ 468,000 | $ 348,000 | $ 343,000 |
| Other .................. | $ 12,000 | $ 110,000 F | $ 115,000 |
| Total ......... | $2,259,000 | $2,849,000 | $3,018,000 |

#### Long-Term Liabilities

| | Feb. 12, 1966 | Jul. 30, 1966 | Aug. 27, 1966 |
|---|---|---|---|
| Notes Payable ......... | $ 33,000 | $ 8,000 | $ 8,000 |
| Reserve for Employee Pensions & Hunsinger Deferred Compensation | $ 289,000 C | $ 169,000 G | $ 166,000 |
| Total ......... | $ 322,000 | $ 177,000 | $ 174,000 |
| Grand Total .... | $2,581,000 | $3,026,000 | $3,192,000 |

**Assuming Inventory at Cost:**

| | | | |
|---|---|---|---|
| Ratio. ................... | 1.34 to 1 | 1.04 to 1 | .98 to 1 |
| Net Working Capital ...... | $ 778,000 | $ 121,000 | ($ 37,000) |
| Assets, Minus Liabilities .. | $1,554,000 | $1,036,000 | $ 879,000 |

**Assuming Leidesdorf Inventory Value:**

| | | | |
|---|---|---|---|
| Ratio. ................... | .64 to 1 | .69 to 1 | .66 to 1 |
| Net Working Capital ....... | ($ 811,000) | ($ 896,000) | ($1,012,000) |
| Assets, Minus Liabilities .. | ($ 35,000) | ($ 19,000) | ($ 96,000) |

See below for notes to financial statement.

**A.** Pursuant to policies adopted by the Debtor to establish a reserve to reduce inventory to last-in, first-out basis, Leidesdorf valued the inventory at the amount shown. The reserves for other dates are estimates.

**B.** The Leidesdorf statement shows the sum of $1,499,000 as being due the Debtor from the parent. The Plan of Arrangement submitted by the parent, however, provides a maximum payment to the Debtor of $750,000.

**C.** The Leidesdorf statement established a reserve for employee pensions of $296,000, and a reserve for deferred compensation payable to Hunsinger in the sum of $150,000. These liabilities were offset by a non-current asset of $157,000 in securities held by United as collateral. $289,000 is the net liability as computed by Leidesdorf.

**D.** This sum included $68,000 in cash on hand and a $380,000 certificate of deposit held for the benefit of creditors under the Plan of Arrangement.

**E.** Merchandise, $492,000; Expenses, $80,000; Leases, $858,000; and $961,000, Accounts Payable frozen under the Plan of Arrangement.

**F.** Including $38,000 of the current portion of the long-term debt.

**G.** Debtor computed this liability as follows:

| | |
|---|---|
| Deferred Compensation ..................$ | 56,000 |
| Reserve for Pensions .....................$ | 272,000 |
| | $328,000 |
| Less, Collateral Pledged | |
| to Appellant .........................$ | 156,000 |
| | $172,000 |
| Less, Investments for an | |
| Undisclosed Purpose .................$ | 3,000 |
| Balance .......................$ | 169,000 |

## APPENDIX C.

### Petitioner's Depo. 4

### Store—Emporium Dept. Stores, Inc.

### Comparative Balance Sheet as of November 26, 1966

| | | This Year $ | Last Year $ |
|---|---|---|---|
| **Assets** | | | |
| | **Current Assets** | | |
| 1 | Cash .................................. | $ 184,947 | $ 233,913 |
| 2 | Cust. Accts. Rec. Less Reserves .......... | 2,372,381 | 3,085,479 |
| 3 | Cust. Accts. Rec. Sold .................... | 1,657,594 | 2,477,344 |
| 4 | Other Receivables | | |
| 5 | Merchandise Inventory (Net) .............. | 1,165,208 | 2,337,051 |
| 6 | Prepaid Expenses ....................... | 99,698 | 127,656 |
| 7 | Other Current Assets .................... | 210,141 | 70,642 |
| 8 | Total Current Assets ........................ | 2,374,781 | 3,377,397 |
| | **Fixed Assets** | | |
| 9 | Land | | |
| 10 | Buildings (Net) | | |
| 11 | Furn. & Fixt. (Net) ...................... | 101,806 | 145,259 |
| 12 | Leasehold Imp. (Net) .................... | 228,611 | 155,749 |
| 13 | Other Fixed Assets (Net) | | |
| 14 | Total Fixed Assets ........................ | 330,417 | 301,008 |
| 15 | Total Other Assets | | |
| 16 | Total Deferred Charges .................... | 159,130 | 158,727 |
| 17 | Inter Co. Account—(Old) .................... | 818,595 | 996,090 |
| 18 | Inter Co. Account—(New) ................... | 37,476 | |
| 19 | Total Assets .............................. | 3,720,399 | 4,833,222 |

**Liabilities**

**Current Liabilities**

| | | | |
|---|---|---|---|
| 20 | Notes Payable—Bank | | |
| 21 | Notes Payable—Other .................... | 248,898 | |
| 22 | Accounts Payable ....................... | 1,454,378 | ·1,884,869 |
| 23 | Accrued Taxes & Expenses ............... | 344,931 | 202,364 |
| 24 | Other Current Liabilities ................. | 61,578 | 88,287 |
| 25 | Current Portion of Long Term Debt ....... | 38,567 | 54,292 |
| 26 | Total Current Liabilities ................... | 2,148,352 | 2,229,812 |

**Long Term Liabilities**

| | | | |
|---|---|---|---|
| 27 | Notes Payable—Insurance ................ | 8,350 | 11,200 |
| 28 | Mortgage Payable—Accts. Pay. .......... | 238,874 | |
| 29 | 7% Debentures Due 1970 | | |
| 30 | Reserve for Pensions .................... | 405,405 | 333,793 |
| 31 | Total Long Term Liabilities .............. | 652,629 | 344,993 |
| 32 | Total Liabilities .......................... | 2,800,981 | 2,574,805 |

**Stockholders' Equity, Etc.**

| | | | |
|---|---|---|---|
| 33 | Common Stock .......................... | 208,990 | 208,990 |
| 34 | 5½% Cumm. Preferred | | |
| 35 | Subordinated Notes—Stockholders | | |
| 36 | Surplus 7/31/66 ......................... | [338,533] | 355,117 |
| 37 | Surplus 8/1/66—11/26/66 ................ | 70,847 | 46,651 |
| 38 | Reserve—Lifo Adjust. ................... | 978,114 | 1,647,659 |
| 39 | Gain on Sale of Real Estate | | |
| 40 | (Less) Treasury Stock—Cost | | |
| 41 | Total Stockholder Equity, etc. ............... | 919,418 | 2,258,417 |
| 42 | **Total Liabilities & Equity, Etc.** .............. | 3,720,399 | 4,833,222 |

**Net Working Capital**

| | | | |
|---|---|---|---|
| 43 | Current Assets .......................... | 2,374,781 | 3,377,397 |
| 44 | Less Current Liabilities ................... | 2,148,352 | 2,229,812 |
| 45 | Net Working Capital ...................... | 226,429 | 1,147,585 |
| 46 | Current Ratio .......................... | 1.1 to 1 | 1.5 to 1 |

Page 4

## STORE: EMPORIUM DEPT. STORES, INC.

### Comparative Profit and Loss Statement
### For Month of November and 4 Months Ending November 26, 1966

| Accounts / Leidesdorf Aug. Adj. | Month | | | | | | Year to Date | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | This Year Amount | % | Planned Amount | % | Last Year Amount | % | This Year Amount | % | Last Year Amount | % |
| 1 Total Net Sales (% of change) | 911,490 | [37.6] | 1,275.0 | (12.7) | 1,460,719 | (2.2) | 3,801,439 | [33.2] | 5,690,059 | (2.9) |
| 2 Less Leased Dept's (% of change) | 232,789 | [45.9] | 275.0 | (36.1) | 430,250 | (1.6) | 855,803 | [46.6] | 1,601,475 | (3.5) |
| 3 Net Owned Sales (% of change) | 678,701 | [34.1] | 1,000.0 | 3.0 | 1,030,469 | (2.5) | 2,945,636 | [28.0] | 4,088,584 | (2.6) |
| 4 Gross Margin 42,094 | 214,204 | 31.6 | 360.0 | 36.0 | 353,940 | 34.3 | 993,253 | 33.7 | 1,370,688 | 33.5 |
| 5 Leased Dept. Income | 28,371 | 4.2 | 33.6 | 3.4 | 39,829 | 3.9 | 106,268 | 3.6 | 146,962 | 3.6 |
| 6 Gross Profit 42,094 | 242,575 | 35.8 | 393.6 | 39.4 | 393,769 | 38.2 | 1,099,521 | 37.3 | 1,157,650 | 37.1 |
| **Expenses:** | | | | | | | | | | |
| 7 Payroll Selling | 61,233 | 9.0 | 75.3 | 7.5 | 78,267 | 7.6 | 281,227 | 9.5 | 324,335 | 7.9 |
| Other | 89,383 | 13.2 | 97.3 | 9.7 | 106,137 | 10.3 | 395,793 | 13.4 | 446,703 | 0.9 |
| 8 All Other Expenses (4025) | 168,815 | 24.9 | 196.6 | 19.7 | 185,428 | 18.0 | 733,353 | 24.9 | 733,957 | 7.9 |
| 9 Total Expenses [4025] | 319,431 | 47.1 | 369.2 | 36.9 | 369,832 | 35.9 | 1,410,373 | 47.9 | 1,504,995 | 36.8 |
| 10 Operating Profit 46117 | [76,856] | (11.3) | 24.4 | 2.4 | 23,937 | 2.2 | [310,852] | (10.6) | 12,665 | .3 |
| 11-A Carrying Charges | 20,274 | 3.0 | 23.0 | 2.3 | 26,414 | 2.6 | 89,698 | 5.0 | 103,967 | 2.5 |
| 11 Other Income [5137] | 1,250 | .2 | 1.1 | .1 | 1,537 | .1 | [ 2,030] | ( .1) | 3,801 | .1 |
| 12 Interest Expense 314 | 23,045 | 3.4 | 17.0 | 1.7 | 18,847 | 1.8 | 71,731 | 2.4 | 73,772 | 1.8 |
| 13 Net Profit or (Loss) (47,668) | [78,377] | [11.5] | 31.5 | 3.2 | 33,041 | 3.2 | [294,915] | (10.0) | 46,651 | 1.1 |
| **Expenses (% to Owned Sales)** | | | | | | | | | | |
| 100 Gen. Management (4025) | 59,268 | 8.7 | 63.4 | 6.3 | 69,670 | 6.8 | 250,183 | 8.5 | 284,014 | 6.9 |
| 200 Control & Office Mgmt. | 12,588 | 1.9 | 13.7 | 1.4 | 13,785 | 1.3 | 57,003 | 1.9 | 58,862 | 1.4 |
| 300 Accounts Rec. & Credit | 15,537 | 2.3 | 17.9 | 1.8 | 19,877 | 1.9 | 69,656 | 2.4 | 83,272 | 2.0 |
| 400 Sales Promotion | 61,840 | 9.1 | 70.6 | 7.1 | 53,202 | 5.2 | 273,836 | 9.3 | 207,178 | 5.1 |
| 500 Superint'y. & Bldg. Oper. | 29,827 | 4.4 | 32.5 | 3.3 | 32,289 | 3.1 | 127,626 | 4.3 | 135,189 | 3.3 |
| 600 Personnel & Welfare | 16,802 | 2.5 | 17.9 | 1.8 | 16,522 | 1.6 | 67,245 | 2.3 | 68,724 | 1.6 |
| 700 Material Handling | 6,519 | 1.0 | 9.8 | 1.0 | 10,608 | 1.0 | 34,490 | 1.2 | 46,446 | 1.1 |
| 800 Direct & Gen. Selling | 79,521 | 11.7 | 103.0 | 10.3 | 104,394 | 10.1 | 357,010 | 12.1 | 411,557 | 10.1 |
| 900 Merchandising | 32,060 | 4.7 | 32.7 | 3.3 | 34,796 | 3.4 | 150,515 | 5.1 | 151,569 | 3.7 |
| 1200 Corp. office charge | 5,469 | .8 | 7.7 | .8 | 14,689 | 1.4 | 22,809 | .8 | 58,184 | 1.4 |
| Total Expenses [4025] | 319,431 | 47.1 | 369.2 | 36.9 | 369,832 | 35.9 | 1,410,373 | 47.9 | 1,504,995 | 36.8 |

Remarks:

Petitioner's Ex. I.

## STORE—EMPORIUM DEPT. STORES, INC.

### Comparative Balance Sheet as of February 25, 1967

| | This Year $ | Last Year $ |
|---|---|---|
| **Assets** | | |
| **Current Assets** | | |
| Cash ....................................$ | 40,943 | $ 347,264 |
| Cust. Accts. Rec. Less Reserves ............ | 2,135,717 | 3,029,631 |
| Cust. Accts. Rec. Sold .................... | 1,526,489 | 2,311,258 |
| Other Receivables | | |
| Merchandise Inventory (Net) .............. | 849,759 | 1,806,656 |
| Prepaid Expense ........................ | 56,882 | 124,753 |
| Other Current Assets .................... | 98,909 | 115,616 |
| Total Current Assets ...................... | 1,655,721 | 3,112,662 |
| **Fixed Assets** | | |
| Land | | |
| Buildings (Net) | | |
| Furn. & Fixt. (Net) ...................... | 97,932 | 108,203 |
| Leasehold Imp. (Net) .................... | 222,605 | 243,663 |
| Other Fixed Assets (Net) | | |
| Total Fixed Assets ...................... | 320,537 | 351,866 |
| Total Other Assets | | |
| Total Deferred Charges ................. | 159,130 | 158,727 |
| Inter Co. Account to 2/12/66 .............. | 750,000 | 1,435,346 |
| After 2/12/66 ...........................[ | 166,662] | |
| Total Assets ........................... | 2,718,726 | 5,058,601 |

**Liabilities**

**Current Liabilities**

| | | | |
|---|---|--:|--:|
| 20 | Notes Payable—Bank | | |
| 21 | Notes Payable—Other ..................... | 75,000 | |
| 22 | Accounts Payable ........................ | 978,035 | 1,986,535 |
| 23 | Accrued Taxes & Expenses ................ | 248,059 | 318,865 |
| 24 | Other Current Liabilities ................. | 29,094 | 62,013 |
| 25 | Current Portion of Long Term Debt ........ | 35,567 | 50,510 |
| 26 | Total Current Liabilities .................... | 1,365,755 | 2,417,923 |

**Long Term Liabilities**

| | | | |
|---|---|--:|--:|
| 27 | Notes Payable—Insurance ................. | 8,349 | 8,800 |
| 28 | Mortgage Payable—Accts. Pay. ............ | 186,381 | |
| 29 | 7% Debentures Due 1970 | | |
| 30 | Reserve for Pensions ..................... | 388,215 | 357,982 |
| 31 | Total Long Term Liabilities .............. | 582,945 | 336,782 |
| 32 | Total Liabilities ........................... | 1,948,700 | 2,754,705 |

**Stockholders' Equity, Etc.**

| | | | |
|---|---|--:|--:|
| 33 | Common Stock .......................... | 208,990 | 208,990 |
| 34 | 5½% Cumm. Preferred | | |
| 35 | Subordinated Notes—Stockholders | | |
| 36 | Surplus 7/31/66 ..........................[ | 276,293] | 355,117 |
| 37 | Surplus 8/1/66—(2/25/67) ...............[ | 140,785] | 92,130 |
| 38 | Reserves—Lifo Adjust. ................... | 978,114 | 1,647,659 |
| 39 | Gain on Sale of Real Estate | | |
| 40 | (Less) Treasury Stock—Cost | | |
| 41 | Total Stockholder Equity, etc. ............. | 770,026 | 2,303,896 |
| 42 | **Total Liabilities & Equity, Etc. ...............** | 2,718,726 | 5,058,601 |

---

**Net Working Capital**

| | | | |
|---|---|--:|--:|
| 43 | Current Assets .......................... | 1,655,721 | 3,112,662 |
| 44 | Less Current Liabilities ................... | 1,365,755 | 2,417,933 |
| 45 | Net Working Capital ..................... | 289,966 | 694,739 |
| 46 | Current Ratio .......................... | 1.2 to 1 | 1.3 to 1 |

Completed 3–9–67 at 2:30 P. M.

## STORE—EMPORIUM DEPT. STORES, INC.
### Comparative Profit and Loss Statement
### For Month of February and 7 Months Ending Feb. 25, 1967

| Accounts | Month This Year Amount | % | Planned Amount | % | Last Year Amount | % | Year to Date This Year Amount | % | Last Year Amount | % |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 Total Net Sales (% of change) | 505,942 | [43.4] | | | 893,344 | (4.8) | 6,642,738 | [36.5] | 10,454,572 | (1.7) |
| 2 Less Leased Dept's (% of change) | 114,487 | [41.6] | | | 195,924 | (34.3) | 1,535,532 | [46.4] | 2,865,264 | (4.0) |
| 3 Net Owned Sales (% of change) | 391,455 | [43.9] | | | 697,420 | 9.0 | 5,107,206 | [32.7] | 7,589,308 | (.8) |
| 4 Gross Margin | 102,720 | 26.2 | | | 227,174 | 32.6 | 1,658,903 | 32.5 | 2,569,686 | 33.8 |
| 5 Leased Dept. Income | 14,054 | 3.6 | | | 21,607 | 3.1 | 186,222 | 3.6 | 263,489 | 3.5 |
| 6 Gross Profit | 116,774 | 29.8 | | | 248,781 | 35.7 | 1,845,125 | 36.1 | 2,833,175 | 37.3 |
| **Expenses:** | | | | | | | | | | |
| 7 Payroll Selling | 53,684 | 13.7 | | | 65,930 | 9.4 | 485,236 | 9.5 | 595,102 | 7.8 |
| Payroll Other | 77,355 | 19.8 | | | 103,690 | 14.9 | 662,022 | 13.0 | 791,246 | 10.4 |
| 8 All Other Expenses | 98,654 | 25.2 | | | 155,079 | 22.2 | 1,212,948 | 23.7 | 1,360,298 | 17.9 |
| 9 Total Expenses | 229,693 | 58.7 | | | 324,699 | 46.5 | 2,360,206 | 46.2 | 2,746,646 | 36.2 |
| 10 Operating Profit | [112,919] | [28.8] | | | 75,918 | (10.9) | [515,081] | [10.1] | 86,529 | 1.1 |
| (11a Carrying Charge) | 21,460 | 5.5 | | | 27,861 | 4.0 | 155,628 | 3.0 | 190,985 | 2.5 |
| 11 Other Income | [225] | [.1] | | | 31,752 | (4.6) | 8,061 | .2 | (31,532) | (.4) |
| 12 Interest Expense | 19,739 | 5.0 | | | 37,177 | 5.3 | 144,352 | 2.8 | 153,852 | 2.0 |
| 13 Net Profit or (Loss) | [111,423] | [28.5] | | | (116,986) | (16.8) | [495,744] | [.9.7] | 92,130 | 1.2 |
| **Expenses (% to Owned Sales):** | | | | | | | | | | |
| 100 Gen. Management | 51,993 | 13.3 | | | 67,248 | 9.6 | 429,701 | 8.4 | 526,236 | 7.0 |
| 200 Control & Office Mgmt. | 10,422 | 2.7 | | | 14,562 | 2.1 | 95,712 | 1.9 | 110,018 | 1.4 |
| 300 Accounts Rec. & Credit | 12,871 | 3.3 | | | 17,376 | 2.5 | 119,316 | 2.3 | 149,468 | 2.0 |
| 400 Sales Promotion | 19,608 | 5.0 | | | 36,905 | 5.3 | 417,705 | 8.2 | 356,901 | 4.7 |
| 500 Superin'ty. & Bldg. Oper. | 29,174 | 7.5 | | | 31,976 | 4.5 | 226,127 | 4.4 | 241,991 | 3.2 |
| 600 Personnel & Welfare | 16,039 | 4.1 | | | 20,496 | 2.9 | 125,819 | 2.5 | 126,157 | 1.6 |
| 700 Material Handling | 4,047 | 1.0 | | | 8,706 | 1.2 | 51,774 | 1.0 | 77,317 | 1.0 |
| 800 Direct & Gen. Selling | 61,728 | 15.8 | | | 79,518 | 11.4 | 617,664 | 12.1 | 775,660 | 10.2 |
| 900 Merchandising | 30,776 | 5.3 | | | 34,512 | 4.9 | 236,531 | -4.6 | 266,211 | 3.5 |
| 1200 Corp. office charge | 3,035 | .8 | | | 13,400 | 1.9 | 39,857 | .8 | 116,687 | 1.5 |
| 1000 Total Expenses | 229,693 | 58.7 | | | 324,699 | 46.5 | 2,360,206 | 46.2 | 2,746,646 | 36.2 |

Remarks: ✓Last discounts on cancelled checks holding at Feb. 12, 1966 in the amount of 32,608,

84

On Petition for Rehearing.

We have carefully reviewed the petition of the appellees for a rehearing and their request that said petition be heard and determined by this Court en banc.

The appellees' petition that the rehearing be heard and determined en banc is denied, as is its request for a rehearing.

While financial statements of the petitioner, antedating the decision of the Referee, were referred to by the Court in a footnote and the appendix to the decision, the Court's decision was based on and amply supported by the record made before the Referee and the Court.

Although the financial statements received in evidence in a proceeding in the Bankruptcy Court for the District of Minnesota seeking to have the petitioner declared a bankrupt, indicated that the petitioner's financial condition continued to deteriorate after the confirmation of the plan, they were not necessary to support the decision of the Court, nor were they so considered.